# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

JOSEPH A. RIVERA,         )
                           )

        Petitioner,      )
                           )

v.                         )        No.: 3:21-CV-299-DCLC-JEM
                           )

BERT BOYD,           )
                           )

        Respondent.    )

## MEMORANDUM OPINION

Petitioner Joseph A. Rivera, an inmate serving a life sentence in the custody of the Tennessee Department of Correction ("TDOC"), has filed a pro se federal habeas action brought pursuant to 28 U.S.C. § 2254 challenging the legality of his confinement under Knox County, Tennessee, judgments of conviction for first-degree felony murder, especially aggravated burglary, and aggravated assault [Doc. 1]. Having considered the submissions of the parties, the State-court record, and the law applicable to Petitioner's claims, the Court finds that the petition should be denied.

## I.    SUMMARY OF EVIDENCE & PROCEDURAL HISTORY

The Tennessee Court of Criminal Appeals ("TCCA") summarized the evidence presented at Petitioner's trial as follows:

> This case arises from the June 5, 2010 killing of Michelle Rivera, the [Petitioner]'s estranged wife. At the trial, Gerald Ross testified that he met the victim online and that they decided to meet for dinner in late April 2010. He said that the victim worked as a massage therapist at a West Knoxville office, that she also had private clients, and that she taught massage therapy. He said the victim was loving, caring, and gentle. Mr. Ross knew that the victim was married but separated from her husband when they met and that she lived alone in an apartment.
>
> Mr. Ross testified that on one occasion before May 16, 2010, he was at the victim's apartment visiting when the [Petitioner] arrived unexpectedly. Mr. Ross said that the [Petitioner] beat on the door and that Mr. Ross went upstairs because he did not

trust the [Petitioner]. Mr. Ross noted the victim had discussed some of her and the [Petitioner]'s relationship issues. Mr. Ross heard the [Petitioner] and the victim talking downstairs and saw from the upstairs bedroom window the [Petitioner] standing outside the front door.

Mr. Ross testified that on May 16, 2010, he and the victim made plans to "go to the mountains" for a day trip, that he drove his Geo Tracker to the victim's apartment, that he parked his vehicle beside the victim's Toyota Corolla, and that the victim drove her car to Sevier County. He said he left the key to his vehicle, along with additional keys on the ring, on the victim's kitchen table. He said the apartment was secure when they left around 9:45 a.m. He said he suggested the trip in order for the victim to get out of town for a few hours because she had been upset about the [Petitioner]'s aggravating her by sending her text messages and calling her cell phone. Mr. Ross said that the victim received a telephone call from the [Petitioner] while they were in Pigeon Forge. He said that although he could not hear everything the [Petitioner] said, he knew it was the [Petitioner] when he heard the caller's voice. Mr. Ross said the look on the victim's face was "great, here we go again" or "I'm not in the mood for you right now." He said the victim handed him the phone and told him that the [Petitioner] wanted to speak to him. Mr. Ross said he declined and noted he and the [Petitioner] had never spoken before that day.

Mr. Ross testified that he ultimately took the cell phone from the victim because Mr. Ross heard the [Petitioner] yelling at the victim. Mr. Ross said the [Petitioner] stated, "Hey, Buddy, you know you're f—— a married woman." Mr. Ross said that he attempted to explain he and the victim were friends but that the [Petitioner] told Mr. Ross to "get [his] game on" because the [Petitioner] wanted to fight Mr. Ross. Mr. Ross said that he explained he would not fight the [Petitioner] and that the [Petitioner] responded, "Well, I'm going to go in the apartment and f—— your truck up." Mr. Ross admitted he told the [Petitioner] he knew where the [Petitioner] lived and worked and threatened the [Petitioner]. Mr. Ross said the victim grabbed the phone and ended the call.

Mr. Ross testified that he and the victim returned to the victim's apartment around 3:00 or 4:00 p.m. and that he saw the "side canvas" of his vehicle was "ripped down." He noted that the front passenger seat had been slashed and the radio removed. He said that the seat was not slashed and the radio was not missing before he and the victim left that morning. He denied giving anyone permission to damage his vehicle. He said that he and the victim entered the victim's apartment, that he saw the back door was open and the door frame damaged, and that he noticed his keys were missing from the kitchen table. He said water had been poured on the victim's laptop. He said the victim called the police to report the incident, and he identified photographs of the damage to his vehicle and to the victim's apartment, which were consistent with Mr. Ross's testimony. Mr. Ross identified a photograph of the [Petitioner]'s truck taken after the [Petitioner]'s arrest on June 5, 2010, and identified Mr. Ross's key ring inside the [Petitioner]'s truck. Mr. Ross said that he and victim discussed whether to file charges against the [Petitioner] for the damage

to Mr. Ross's vehicle and that he decided against it. Mr. Ross said the damage to his vehicle was about $1000.

Mr. Ross testified that his relationship with the victim "increased" in the weeks following the May 16, 2010 incident and that they became close friends. He said that on June 5, he spoke to the victim in the morning and that they made plans for the victim to come to his home around 7:00 p.m. for dinner. He said the victim taught massage therapy that day and called him a few times throughout the day. He said he sent the victim a text message around 4:30 p.m. but received no response, which was unusual because the victim always responded quickly. He said he sent a second message but received no response. Mr. Ross said that he had a bad feeling and that he drove to the victim's apartment. He said he arrived at 5:30 or 6:00 p.m. and saw police, emergency medical personnel, and news reporters.

On cross-examination, Mr. Ross testified that he did not know what transpired at the victim's apartment on June 5, 2010. He said that on May 16, he and the victim were at the victim's apartment for thirty minutes before leaving for Sevier County. He agreed it was possible they did not leave the victim's apartment until 10:15 a.m. He said that he and the victim were at a convenience store in Pigeon Forge when the [Petitioner] called the victim's cell phone. When asked if it was possible the victim called the [Petitioner], Mr. Ross said that when he left the store, the victim was on the telephone talking to the [Petitioner]. Mr. Ross said it would not have surprised him that the victim frequently called him after the victim called the [Petitioner]. Mr. Ross agreed that at the time his vehicle was vandalized, he had known the victim for about two weeks.

A petition for an order of protection was received as an exhibit. The petition was completed by the victim on May 17, 2010, and the victim alleged that the [Petitioner] broke into her apartment on May 16, took her friend's keys from the kitchen table, and vandalized her friend's vehicle. The victim stated in the petition that the [Petitioner] said "he was going to f—— up my friend's truck since he was f—— me." The victim also alleged that on May 17, the [Petitioner] left a voicemail message on her cell phone stating, "Remember what happened to Shawn?" The victim explained that "Shawn was shot by his lover's husband." Finally, the victim stated that several months previously when she and the [Petitioner] were engaged in "intimate relations," the [Petitioner] became angry and began slapping her across the face, "while he was hurting [her] inside." The ex parte order of protection was served upon the [Petitioner] on May 24. An order to show cause why the [Petitioner] should not be held in contempt of court was issued and served upon the [Petitioner] on June 10. The motion for an order to show cause was submitted by the victim's attorney, who alleged that on June 5, the [Petitioner] knocked the victim to the ground, climbed on top of her, held her down, choked her, hit her multiple times, and dragged her inside her apartment after being confronted by the victim's neighbor. The motion alleged that after closing the door to the victim's apartment, the [Petitioner] killed the victim. The petition, ex parte order, and show cause motion were dismissed on October 28, 2010.

3

The recordings of two 9–1–1 calls placed on the day of the killing were received as exhibits and played for the jury. During the first call, a male caller, later identified as Stephen Wicks, reported a domestic dispute at the victim's apartment and stated the victim was being beaten by her boyfriend. Mr. Wicks described the boyfriend's clothes, noting the man was not wearing a shirt and had gray hair. Mr. Wicks said he approached the man and woman because Mr. Wicks heard the woman's screams. Mr. Wicks said that he asked if "you" were okay and that the man said they were having a dispute. Mr. Wicks said the man "was on top" of the woman and looked as though he was choking or hitting the woman. Mr. Wicks said the woman continued screaming, and the man closed the door to the apartment, at which time it became quiet.

During the second call, Angela Rivera, the [Petitioner]'s former spouse, stated that police were at her home asking questions about the [Petitioner] earlier in the evening and that she had information about the [Petitioner]. Ms. Rivera was crying, and she reported that the [Petitioner] called her and said he had "killed his wife." She said the [Petitioner] refused to tell her his location and told the 9–1–1 dispatcher that she was at home. She said the [Petitioner] threatened to kill himself because of "what he did." She said the only detail the [Petitioner] provided was that he killed his wife because she threatened to kill Ms. Rivera's and the [Petitioner]'s children. Ms. Rivera stated that she told the [Petitioner] "not to do anything" and that the [Petitioner] responded he was not going to spend the remainder of his life in prison. When asked what the victim threatened to do to the [Petitioner]'s children, Ms. Rivera said the victim threatened to kill Ms. Rivera's and the [Petitioner]'s children. She did not know the [Petitioner]'s whereabouts.

Eric Dilworth testified that in June 2010, he and Jennifer Parsons were the victim's neighbors at the apartment complex where the killing occurred. He recalled that the victim moved into her apartment about one month before her death and that she introduced herself not long afterward. He said generally they only spoke in passing but recalled one conversation about her husband a few weeks before her death. He said the victim told him that she was having problems with her former husband, that she described her former husband's truck, and that she told Mr. Dilworth to "just keep a heads-up." Mr. Dilworth said the victim did not describe the [Petitioner].

Mr. Dilworth testified that on June 5, 2010, at 3:30 p.m., he was walking from his apartment to his car when he saw the victim. He said the victim was sitting on the front step outside her apartment talking to the [Petitioner], who was kneeling in front of the victim. Mr. Dilworth could not hear their conversation but saw a blue truck parked beside the victim's car. Mr. Dilworth said that he asked the victim if she was okay in order to gauge her demeanor and that the victim waved at him and returned to her conversation with the [Petitioner], although the victim was possibly crying. Mr. Dilworth left and returned before 5:00 p.m.

4

Mr. Dilworth testified that when he returned home, the blue truck was gone and nobody was outside the victim's apartment. He said that Ms. Parsons was getting ready for work when he arrived, that he began watching television, and that he and Ms. Parsons heard a woman screaming, "thuds against the wall," and loud noises. Mr. Dilworth said he opened the front door and looked to his left, the direction from which they heard the noises. He said he saw the [Petitioner] on top of the victim, dragging her inside the victim's apartment while she screamed. He noted that the [Petitioner] was straddling the victim's body and that the [Petitioner] had his hands around the victim's neck. He said that he did not recall any particular noises as the [Petitioner] dragged the victim inside her apartment but that he remembered the victim's kicking her legs.

Mr. Dilworth testified that the events occurred quickly, that the apartment door closed before he could run twenty yards, and that he heard the door lock. He said that although he did not hear the victim scream after he left his apartment, he saw the victim kicking her legs in an odd manner and noted that her legs were "kicking in the air." He said that as the [Petitioner] dragged the victim, Stephen Wicks walked to Mr. Dilworth's location. Mr. Dilworth and Mr. Wicks had never met, and Mr. Dilworth said he had never seen the [Petitioner] before June 5.

Mr. Dilworth testified that he banged on the victim's apartment door and yelled at the [Petitioner] to come outside. Mr. Dilworth said he heard the [Petitioner] say from inside the apartment, "Go away. This is a domestic dispute." Mr. Dilworth recalled Mr. Wicks's calling 9–1–1. Mr. Dilworth and Mr. Wicks discussed what to do and decided to walk around to the back door of the victim's apartment. Mr. Dilworth said that when he and Mr. Wicks arrived at the rear of the building, Mr. Dilworth saw the [Petitioner] "walking briskly away" from the building. Mr. Dilworth said he saw the [Petitioner] remove a prescription bottle from his pocket and throw it into a pile of brush. Mr. Dilworth said he lost sight of the [Petitioner] but seconds later saw the [Petitioner] jump over a fence. Mr. Dilworth and Mr. Wicks split up to find the [Petitioner], and Mr. Dilworth said he saw the [Petitioner] climb over the same fence again. Mr. Dilworth lost sight of the [Petitioner] again and did not see the [Petitioner] until the blue truck was leaving the complex. He said the [Petitioner] wore the same clothes he wore earlier that afternoon and was driving the same truck. On cross-examination, Mr. Dilworth stated that he refused to talk to the defense investigator.

Jennifer Parsons testified that on June 5, 2010, the victim had been her and Mr. Dilworth's neighbor for three to five months. Although Ms. Parsons did not know the victim well, the women spoke when they walked their dogs. Ms. Parsons noted the victim had a beagle named Sarah. Ms. Parsons said that in the weeks before the killing, the victim told her to be on the lookout for a blue truck. Ms. Parsons recalled the victim's stating that the truck belonged to her former husband and that they had been having problems.

5

Ms. Parsons testified that on June 5, 2010, between 1:00 and 3:00 p.m., she heard a loud noise and banging coming from next door and that she looked out the window and saw the [Petitioner]'s blue truck parked in front of the victim's apartment. She described the noises she heard as a struggle and said she heard a man and a woman yelling. She was home alone at the time but reported what she heard to Mr. Dilworth when he returned home. She said that when Mr. Dilworth returned, the victim and the [Petitioner] were sitting on the step outside the victim's apartment.

Ms. Parsons testified that later that afternoon, she was upstairs getting ready for work when she heard banging coming from the victim's apartment. She heard the victim screaming and noted the screams were like nothing she had ever heard. She said the screams were "scary" and "desperate." Ms. Parsons said she ran downstairs and was met by Mr. Dilworth, who also heard the screams. She said that she and Mr. Dilworth opened their apartment door and that Ms. Parsons saw the victim's lower body being pulled inside the victim's apartment. Ms. Parsons said that the victim was not walking, that the victim's toes were pointing toward the sky, and that the victim's heels were dragging the ground. She said that she "barely saw" the [Petitioner] but saw enough to know it was the [Petitioner] who was dragging the victim inside the apartment and was holding the victim by her neck. Ms. Parsons said that she and Mr. Dilworth attempted to help the victim but that by the time they reached the victim's apartment, the [Petitioner] had closed and locked the door. She said that after the door was locked, she no longer heard the victim. She recalled that Mr. Dilworth banged on the door but said that nobody answered, although she heard sounds of a struggle.

Ms. Parsons testified that on the victim's porch, Ms. Parsons saw a purse, makeup bag, and massage table. Ms. Parson said she did not see the [Petitioner]'s blue truck parked outside the victim's apartment when Ms. Parsons saw the [Petitioner] dragging the victim inside. Ms. Parsons said that Mr. Wicks assisted her and Mr. Dilworth and that she told Mr. Wicks to call 9–1–1. She said that while Mr. Dilworth banged on the door, the [Petitioner] yelled from inside the apartment "to go away, that this was a domestic dispute, kind of mind our own business." She said that after a few minutes, everything became "dead quiet."

Ms. Parsons testified that she followed Mr. Dilworth and Mr. Wicks to the rear of the apartment building but returned to her apartment when Mr. Dilworth told her to return. She said that as she walked to her apartment, she saw the [Petitioner] jump twice over a fence along an adjoining property and that the [Petitioner] ran in the direction of the swimming pool. She said that she decided to run to the victim's apartment and that she banged on the door and begged the victim to open the door. Ms. Parsons did not see the [Petitioner] or the blue truck again.

On cross-examination, Ms. Parsons testified that Mr. Dilworth did not mention the defense investigator's wanting to speak with her before the trial. She recalled speaking to the [Petitioner]'s previous attorneys and possibly speaking to an

6

investigator. She said that the [Petitioner] was standing in the doorway of the victim's apartment at the foyer when Ms. Parsons saw the [Petitioner] dragging the victim.

Stephen Wicks testified that on June 5, 2010, he was visiting his sister-in-law and niece, who lived at the apartment complex. He said he and about fourteen other individuals were celebrating his niece's college graduation. He said that he did not know the victim, the [Petitioner], Mr. Dilworth, or Ms. Parsons before the incident in this case. He said that around 5:00 p.m., he retrieved a football from the trunk of his car and that he heard a scream. He said he turned to the direction from which the scream came but did not see anything unusual. He said, though, he heard a second scream seconds later.

Mr. Wicks testified that he saw Mr. Dilworth and a partially opened apartment door and walked toward the apartment. Mr. Wicks saw a bare foot visible through the open doorway and asked if everything was okay. He said that the apartment was dark but that he saw a bare back and asked if everything was okay. Mr. Wicks said that it appeared the [Petitioner] was leaning over something and that the [Petitioner] turned toward him and said, "Yes, it's just a domestic." Mr. Wicks said the [Petitioner] closed the door. Mr. Wicks turned around hoping to find someone who knew what was happening and saw Mr. Dilworth. Mr. Wicks and Mr. Dilworth talked for a few seconds and agreed to call 9–1–1. Mr. Wicks said he did not hear any noises coming from the apartment after the door closed.

Mr. Wicks testified that after speaking to the 9–1–1 dispatcher, he rejoined the graduation party but returned to the victim's apartment because he felt as though something was wrong. He said that he walked to the rear of the building and that Mr. Dilworth followed him. He said he saw the [Petitioner] leaving the victim's apartment through what appeared to be a sliding-glass door. Mr. Wicks followed the [Petitioner] and saw the [Petitioner] throw something in the weeds, climb over a fence, and run through the apartment complex's parking lot toward a blue truck. Mr. Wicks chased the [Petitioner] but said the [Petitioner] got into the blue truck and drove away.

Mr. Wicks testified that he returned to look for the item the [Petitioner] threw in the weeds. He said that he saw two prescription bottles reflecting the [Petitioner]'s name. Mr. Wicks said he picked up the bottles using a napkin and delivered them to the responding police officers.

On cross-examination, Mr. Wicks testified that Mr. Dilworth was not standing on the porch of the victim's apartment when he saw the [Petitioner]'s bare back and the victim's bare foot. He said it would not have surprised him if the building did not contain sliding-glass doors and noted a privacy fence was on the back porch area. He agreed that the prescription bottles were empty and that no pills were lying on the ground.

7

Angela Childers testified that she lived at the victim's apartment complex at the time of the incident and that on June 5, 2010, at around 5:00 p.m., she left her apartment to attend a party. She said that after she stepped out of her apartment, she saw the [Petitioner] running toward a blue truck. Ms. Childers said she "took down" the truck's license plate number because the [Petitioner]'s behavior was odd and because someone was chasing him. She said the [Petitioner] drove away in a hurry.

On cross-examination, Ms. Childers testified that she recalled an investigator's contacting her about the present case and that she had nothing to say to the investigator. She agreed, though, she told the investigator that she saw the [Petitioner] run to the truck.

Debra Stutsman testified that she managed the apartment complex where the victim lived and a nearby apartment complex. She said she knew the [Petitioner] because he, the victim, and the [Petitioner]'s two sons from a previous marriage initially moved into the nearby apartment complex in February 2009. She recalled the [Petitioner] performed a couple of odd jobs while he lived at the complex. She said the victim moved out of the unit the victim shared with the [Petitioner] at the nearby complex in March 2010. Ms. Stutsman said that the victim stayed with friends and that the victim said she and the [Petitioner] were having "difficulties." Ms. Stutsman said the victim rented the apartment unit where the killing occurred. Ms. Stutsman understood that the victim and the [Petitioner] decided to separate until they worked through their marital issues.

Ms. Stutsman testified that sometime in 2008, the victim rented a two-bedroom apartment unit at the nearby complex. She said that in February 2009, she met with the victim and the [Petitioner], who wanted to transfer the lease without having to undergo the full application process again. Ms. Stutsman asked "if there would be problems," and the [Petitioner] responded, "N[o], there would not." She approved the request and said the victim, the [Petitioner], and the [Petitioner]'s sons moved into the unit and stayed until March 2010.

Ms. Stutsman testified that in the spring 2010, the victim and the [Petitioner] requested the victim move into an apartment unit at the complex where the killing occurred. The victim signed a lease for a unit, and Ms. Stutsman noted the [Petitioner]'s name was not on the lease. She said the [Petitioner] and his two sons moved into a one-bedroom unit at the nearby complex.

Ms. Stutsman testified that she knew about the break-in at the victim's apartment in 2010 and that the victim obtained an order of protection. She said the [Petitioner] drove a dark blue truck. After learning of the order of protection, Ms. Stutsman said she asked a tenant, who collected rent checks, to be on the lookout for the [Petitioner]'s blue truck. Ms. Stutsman said she told the [Petitioner] to stay away from the property. She noted that after the victim obtained the order of protection but before the killing, she saw the [Petitioner] drive through the apartment complex. She said she called the [Petitioner], who said he was only looking around the area,

and told him not to return to the property. She said that although she did not see the [Petitioner] on the property afterward, she received communications from other people reporting the [Petitioner]'s presence.

On cross-examination, Ms. Stutsman testified that she told the defense investigator that she would have never thought "anything like this would happen." She said that although she only saw the [Petitioner] on the property once after the victim obtained the order of protection, she saw the [Petitioner]'s truck parked near the pool another time. She said she unsuccessfully attempted to find the [Petitioner].

Knox County Sheriff's Patrolman Jeremy McCord testified that he and additional patrolmen responded to the scene after receiving information about a domestic assault in progress. He said his responsibility was to talk to anyone who might have been inside the victim's apartment. He said, though, the doors were locked. He said that his supervisor was informed and that he was granted permission to enter the victim's apartment. Patrolman McCord said that he entered the apartment and that he saw the victim was deceased and lying on the floor with something around her neck. He identified photographs of the victim's apartment, which depicted the living room area where the victim was found.

Lenoir City Police Officer Jason Felts testified that on June 5, 2010, at 9:20 p.m., he received information to be on the lookout for a blue Toyota Tacoma truck with a specific license plate number. He said that sometime later, he received information that GPS tracking of the [Petitioner]'s cell phone placed him at a particular location. Officer Felts responded to the general location and saw the truck drive by his police cruiser. Officer Felts said he followed the truck for about three miles, did not observe any traffic violations, and initiated a stop after Loudon County Sheriff's Patrolman Mike Watkins arrived to provide assistance. Officer Felts said that when he activated his blue lights, the truck's speed increased. He said that the truck's speed fluctuated, that the truck failed to stop at a traffic light, and that the truck ultimately crashed in a ditch. Officer Felts stated that he and Patrolman Watkins approached the truck and told the [Petitioner] to show his hands and that the [Petitioner] refused. Officer Felts said that Patrolman Watkins opened the driver's side door, pulled out the [Petitioner], and placed him under arrest. Officer Felts said the [Petitioner]'s nose was bleeding when they approached the truck. A video recording from Patrolman Watkins's vehicle was played for the jury, which was consistent with Officer Felts's testimony.

Officer Felts testified that the [Petitioner] did not resist or speak when Patrolman Watkins arrested the [Petitioner]. Officer Felts did not attempt to question the [Petitioner] but attempted to learn if the [Petitioner] needed medical attention. On cross-examination, Officer Felts stated that he thought the [Petitioner]'s facial injuries were the result of the [Petitioner]'s driving his truck into the ditch.

Knox County Sheriff's Crime Scene Officer Traci Tassey testified that on June 5, 2010, she processed the scene where the victim was found and the scene where the

9

[Petitioner] was apprehended. She said that at a later date, she took photographs of the clothes the victim wore at the time of her death. Officer Tassey identified photographs she took at the victim's apartment, which showed the victim's purse, cosmetic bag, and massage table on the front porch, the victim's lying on the floor just inside the front door with a vacuum cleaner cord around her neck, a box cutter and a necklace lying on the floor beside the victim, and a muddy shoe print just inside the back door. Photographs of the area surrounding where the victim was found showed overturned furniture.

Officer Tassey testified that she also processed the victim's apartment two weeks before the victim's death when the victim's back door had been kicked in by someone. She noted that the photographs she took on June 5 reflected the back door had been repaired. Photographs taken at the times of the break-in and the killing were received as exhibits, and were consistent with Officer Tassey's testimony. Photographs of two prescription bottles reflecting the [Petitioner]'s name were received as exhibits.

Officer Tassey testified that she took photographs at the location where the [Petitioner] was apprehended. Photographs of the interior of the [Petitioner]'s truck showed a white shirt with a red substance on it, a checkbook reflecting the [Petitioner]'s name, and a ring of keys, including a key reflecting the GEO emblem. Officer Tassey identified photographs she took of the [Petitioner] after his arrest. The photographs showed the bottom of the [Petitioner]'s shoes and the [Petitioner]'s face. The photographs showed injuries to the [Petitioner]'s face and a red substance on the [Petitioner]'s shirt. Photographs of the [Petitioner]'s hands showed no injuries, but Officer Tassey stated the [Petitioner] had injuries that were not visible in the photographs. Photographs of the [Petitioner]'s neck and shoulder showed old bruises and a "minor scratch" on the left side of the collar bone.

On cross-examination, Officer Tassey testified that a Bible was found in the [Petitioner]'s truck, although the item was identified in the police evidence log as a red book. She agreed that the red substance on the white shirt found inside the [Petitioner]'s truck was the [Petitioner]'s blood and that the blood was the result of the [Petitioner]'s face striking the steering wheel or dash when the [Petitioner]'s truck entered the ditch.

Knox County Sheriff's Detective Dale Dantzler testified that he responded to the victim's apartment on June 5, 2010, and that he became the officer-in-charge. He had previous encounters with the victim and the [Petitioner] and said the officers began looking for the [Petitioner] based upon witness statements. He said that three cell phones were recovered during the investigation, including a BlackBerry at the victim's apartment and two phones inside the [Petitioner]'s truck.

Tennessee Bureau of Investigation (TBI) Special Agent Jennifer Millsaps, an expert in DNA science, testified that she analyzed the victim's right and left fingernail clippings, the power cord found around the victim's neck, and buccal

swabs obtained from the [Petitioner]. Relative to the left and right fingernail clippings, Agent Millsaps detected a mixture of genetic material from two people and concluded that the major contributor was the victim and that the minor contributor was the [Petitioner]. She said relative to the left-hand fingernail clippings, the probability of another person in the Caucasian population having the same profile was one in 601,000. Relative to the right-hand fingernail clippings, Agent Millsaps said the probability of another person in the Caucasian population having the same profile was one in 6,169,000.

Agent Millsaps testified that the [Petitioner]'s DNA was found on the white shirt found inside the [Petitioner]'s truck and the clothing the [Petitioner] wore at the time of his arrest. Relative to the power cord, her analysis showed a mixture of genetic material from two people. She concluded that the major contributor was the victim, that the [Petitioner] was excluded as the minor contributor, and that further information regarding the minor contributor was inconclusive because of insufficient or degraded DNA.

On cross-examination, Agent Millsaps testified that it was common for people who lived together to leave behind DNA on items they shared. She agreed she could not determine when the DNA was deposited under the victim's fingernails.

Knox County Sherriff's Detective Angela Daniels testified that she analyzed an Alltel cell phone recovered from the [Petitioner]'s truck and that the phone was registered to the [Petitioner]. She said the phone had a Louisiana number and had inactive service when it was recovered. She said the phone's data was dated between July 16, 2009, and March 18, 2010. She said every phone call and text message, except those from the phone company, were with someone identified in the contact list as "Donna." She said the communications with Donna included sixty-three incoming text messages, two outgoing text messages, and thirty outgoing phone calls. She said that she took photographs of each screen on the phone. She said that the two outgoing text messages were photographs of a motorcycle and that the majority of the incoming text messages were supportive, which included statements such as "I love you." Photographs of each screen reflecting the messages were received as an exhibit.

On cross-examination, Detective Daniels testified that she did not investigate the present case and did not attempt to contact Donna, although the corresponding telephone number was saved in the cell phone. She said, though, she learned the billing statements for the phone number were addressed to Donna Kingsmill.

Knox County Sheriff's Lieutenant George Edlund testified that he analyzed a U.S. Cellular cell phone recovered from the [Petitioner]'s truck and that he received three days' of text message records from the service provider. Lieutenant Edlund said his examination of the phone showed no text messages and no dialed, received, or missed telephone calls. He said, though, the records from the service provider showed various communications between the [Petitioner] and the victim. He said

11

that the records between May 14, 2010, and June 5, 2010, showed 214 telephone calls from the [Petitioner] to the victim. The records showed that the victim answered sixty-seven calls and that 147 calls were answered by the victim's voicemail. The records reflected that the [Petitioner] placed a final call to the victim on June 5, at 3:18 p.m., which was answered by the victim's voicemail. Relative to the victim's calling the [Petitioner], the records showed that the [Petitioner] answered forty-one of the victim's forty-seven calls. Six phone calls were answered by the [Petitioner]'s voicemail. The records showed that the victim last called the [Petitioner] on June 5, at 2:22 p.m., that the [Petitioner] answered the phone, and that the conversation lasted seventy-three seconds. Relative to text messages, the records showed 160 messages, fifty-seven of which were sent by the victim and 103 of which were sent by the [Petitioner]. The victim's last message to the [Petitioner] was sent on June 4, at 10:22 p.m., and the [Petitioner]'s last message to the victim was June 5, at 1:16 p.m. The records did not reflect the substance of the voicemail and text messages.

On cross-examination, Lieutenant Edlund testified that he did not analyze the victim's cell phone and that he only examined the [Petitioner]'s U.S. Cellular phone for communications between the [Petitioner] and the victim. Lieutenant Edlund did not know how many of the [Petitioner]'s incoming phone calls were answered by voicemail. He was unaware the [Petitioner] was involved in a violent collision before the phone was recovered by the police and agreed the wreck could have impacted the phone's data.

On redirect examination, Lieutenant Edlund testified that he found images and names in the contact list on the phone. On recross-examination, he stated that "low-end" phones such as the phone analyzed did not allow for data to be downloaded by the computer software used by the sheriff's office.

Knox County Sheriff's Officer Edward Wassman, Jr., testified that he examined a BlackBerry cell phone recovered near the victim's body. He said that his examination focused on May 17, 2010, through June 5, 2010, and that he received the victim's cell phone records from the service provider. Relative to text messages, Officer Wassman said the phone contained few messages, although the phone records showed additional messages. He said the records showed messages from the [Petitioner]'s phone that were not stored on the victim's cell phone. Officer Wassman said the victim's phone contained a message dated June 2, 2010, at 9:13 p.m., from the [Petitioner]'s phone, which read, "The kids want to know if you got [sic] thar tix." Officer Wassman said no response was stored on the victim's phone. Officer Wassman testified that the service provider's records showed more than seventy-six telephone calls between the [Petitioner]'s and the victim's cell phones between May 17, 2010, and June 5, 2010. He said that the victim's phone showed few text messages before June 2. He said that on June 2, at 7:31 p.m., the victim's phone received a message from someone identified as Tony in the contact list stating, "The beginning was good but things fell apart. I blame no one for it because I have everything I need now. Dad talks about things. He's done it ... Dad talks

12

about things he's done to you. It's a nightmare. He's—he's sorry and so am I. –T." The victim's phone received a second message from Tony at 7:31 p.m. stating, "I hope you're getting better. You can text me back anytime. There won't be any trouble. We love you. –T." The third message at 8:38 p.m. stated, "Michelle, I don't know where we went wrong. Let's stop fighting and get along. Dad told us stuff, and I know he is really sorry. I really hope this can be fixed."

Officer Wassman testified that on June 5, 2010, at 4:00 p.m., a text message was sent from the victim's cell phone to someone identified as Angie Awake Reiki in the contact list asking about the victim's work schedule and stating the victim was attempting to plan her weekend. The incoming response stated that the victim was scheduled to finish work no later than 7:00 p.m. At 4:03 p.m., a message was sent from the victim's phone stating she wanted to be finished with work by 7:00 p.m. because she had things to do in the Maryville area. Officer Wassman said the last outgoing communication from the victim's phone was a telephone call to Angie Awake Reiki at 4:37 p.m. and lasted one minute. He noted, though, that the victim's phone received a text message at 5:18 p.m. from someone identified as Jerry Work in the contact list, which was marked as unread. Officer Wassman said any incoming communications after 5:18 p.m. were unread or unanswered.

On cross-examination, Officer Wassman testified that communications between the [Petitioner]'s and the victim's cell phones occurred before May 16. He agreed the victim's phone called the [Petitioner]'s phone numerous times. He agreed that on May 16, the [Petitioner]'s phone called the victim's phone at 5:33 a.m. and that the call lasted about fifty-three minutes. He said that a second May 16 call was placed from the [Petitioner]'s phone to the victim's phone at 6:57 a.m. and lasted about ten minutes and that there were no additional calls between the phones until 7:04 p.m. Officer Wassman said he was not able to recover the deleted text messages from the victim's phone.

Knox County Sheriff's Detective Greg Faulkner testified that he assisted Detective Brad Hall during the [Petitioner]'s police interview. A video recording of the interview was played for the jury.

In the recording, the detectives asked the [Petitioner] to explain the events leading to the day's events. The [Petitioner] said that he had learned the victim was dating one of her clients, that he had confronted her about the relationship, and that they had been arguing for a few months. The [Petitioner] recalled previous incidents in which the victim was violent toward him and his son Tony. He discussed one incident in which the victim entered his and his children's apartment at 1:00 a.m. He said the victim kicked in the apartment door, held a knife, and attempted to hurt him. He said he took the knife from the victim, threw it on the floor, and told the victim she could not treat him this way. He recalled a second incident in which the victim blocked the [Petitioner]'s truck with her car and chased the [Petitioner] and Tony on the interstate. The detective asked the [Petitioner] why the victim would act violently toward him when the victim was dating another person, but the

13

[Petitioner]'s response was inaudible. The [Petitioner] said that he and the victim had been separated since November 2009 and that he paid the initial costs for the victim's apartment.

Relative to the events on the day of the killing, the [Petitioner] said he and the victim argued about the victim's "boyfriend." He did not recall when he arrived at the victim's apartment but knew it was daylight. He said that the victim was home when he arrived, that the victim allowed him inside the apartment, and that they argued.

The [Petitioner] stated that a couple weeks before the killing, he went to the victim's apartment, that he told the victim he loved her, and that the victim told him she wanted the [Petitioner] to "get another woman." Although the [Petitioner] said he did not have "another woman" at that time, he did at the time of the interview. The [Petitioner] said he wanted to repair the marriage. He said he began but later abandoned divorce proceedings because he and the victim wanted to reconcile.

When asked about the day of the killing, the [Petitioner] said he went to the victim's apartment because he wanted to discuss how to repair the marriage. He said the victim, though, was in a relationship with someone else and wanted to "move on" with her life. He said the victim wanted a divorce, although he did not. He said the victim threatened to kill his son if he did not agree to a divorce. The [Petitioner] said, though, this incident occurred two weeks before the killing.

The detectives again attempted to focus the [Petitioner]'s attention to the day of the killing. When asked what happened at the victim's apartment on the day of the killing, the [Petitioner] said the victim called him and told him to come to her apartment. He said they talked, and he recalled the victim's saying, "I can do better than you." The [Petitioner] denied arguing on the front porch. He could not recall what time he arrived or how long he stayed at the apartment. The [Petitioner] stated that the day of the killing was the first time their arguments became physical. He said that while they argued in the kitchen, he slapped and punched the victim in the face. He said later, though, they were in the living room. He said that the victim fell on the floor after he hit her and that he had never seen the look in the victim's eyes. He denied grabbing the vacuum cleaner or leaving the apartment through the back door. When asked where he parked his vehicle, the [Petitioner] said he parked it "in the other parking lot," although he did not know why. The detectives asked the [Petitioner] if he left the apartment through the back door, walked behind the building, walked by additional apartment buildings, jumped over a fence, and returned to his truck. The [Petitioner] said that the person who gave that report to the detectives lied. The [Petitioner] had no explanation why prescription bottles with his name were found behind the victim's apartment building but said the victim might have taken them. He also said he did not remember if he threw them in the bushes.

14

On cross-examination, Detective Greg Faulkner testified that the [Petitioner] was coherent, although the [Petitioner] talked about events one month before the killing when the detectives asked him about the day of the homicide. Detective Faulkner thought the [Petitioner] was attempting to avoid discussing the killing by talking about previous events. He denied the [Petitioner] appeared confused during the interview.

Detective Faulkner testified that he believed the [Petitioner]'s stating he received a telephone call was related to the [Petitioner]'s learning that the victim was romantically involved with a client. He agreed the [Petitioner] filed a complaint for divorce but later told his attorney to stop the proceedings. Detective Faulkner agreed that during the interview, he and Detective Hall were deceptive about the evidence against the [Petitioner] relative to what witnesses saw and fingerprints on the prescription bottles.

Angela Rivera, the [Petitioner]'s former wife, testified that she and the [Petitioner] married on June 30, 1984, and that they were married fourteen years before divorcing on August 23, 1998. She said she and the [Petitioner] had two adult children, Anthony and Maria Rivera. She said that she thought the [Petitioner] and the victim married in 1998 but did not know which month. She said that beginning in 2006, the children lived with the [Petitioner] and the victim. Ms. Rivera said that in 2010, the [Petitioner] periodically called her to discuss his and the victim's marital difficulties.

Ms. Rivera testified that on June 5, 2010, she learned of the victim's death from the [Petitioner]'s girlfriend, Lisa Whittaker. Ms. Rivera said the police came to her home looking for the [Petitioner]. Ms. Rivera said she attempted to contact the [Petitioner], but he did not answer his cell phone. She said the [Petitioner] called her around 9:20 p.m. and initially sounded normal. She said she questioned the [Petitioner] about what he had done and told him the police had been to her home and had handcuffed their children. She said the [Petitioner] calmly responded, "I did it. I killed Michelle." She noted the [Petitioner] slurred his words and said the [Petitioner] might have been drinking alcohol. When Ms. Rivera asked the [Petitioner] why he killed the victim, he said that the victim threatened to kill Maria and Anthony, whom they referred to as Tony, and that he could not allow the victim to hurt them. Ms. Rivera said that the [Petitioner] threatened to kill himself, that she told him the children were traumatized enough, and that the [Petitioner] said, "You want to see me spend the rest of my life in jail? It's not worth it." She said that the [Petitioner] ended the conversation quickly and that she contacted the police.

On cross-examination, Ms. Rivera testified that the [Petitioner]'s mental breakdown and his psychiatric hospitalization were factors leading to her and the [Petitioner]'s divorce. She denied, though, knowing about any additional mental health hospitalizations. She said that the [Petitioner] sought treatment after they

were separated and that the [Petitioner] became upset after learning "something was wrong with his brain chemistry."

Ms. Rivera testified that she had a poor opinion of the victim and that she probably told the [Petitioner]'s previous attorney that the victim "was a b—— from h——." She said the victim was "an evil person," who destroyed Ms. Rivera's relationship with her children. Ms. Rivera agreed the victim prevented Ms. Rivera from visiting her children when the children lived with the [Petitioner] and the victim. Although she denied the police told her that the [Petitioner] had killed the victim, she agreed she might have stated in the voicemail she left on the [Petitioner]'s cell phone that the police said he had killed the victim. Relative to the [Petitioner]'s returning her call, she denied the [Petitioner] said, "Yeah, the police said I did it. They're my judge, jury, and executioner. They've already decided I did it."

On redirect examination, Ms. Rivera testified that the [Petitioner]'s admission to the psychiatric hospital was in early 1995 after returning home from their separation. She said that the previous admission occurred in Nashville when the [Petitioner]'s then-girlfriend lived in Nashville. Ms. Rivera said the [Petitioner] threatened suicide.

Ms. Rivera testified that she learned the victim had moved out of the apartment the victim shared with the [Petitioner] and the children. Ms. Rivera said that after the victim moved out of the apartment, Ms. Rivera's relationship with her children began to heal but that Ms. Rivera had no contact with her children at the time of the trial. Ms. Rivera said she was not provided a reason for the children's ending their relationship with her, but she recalled the [Petitioner] told her that the victim said she was going to kill the children and that he was going to commit suicide. Ms. Rivera, though, did not believe the [Petitioner] because his threatening suicide became a habit and a means to garner attention.

Dr. Steven Cogswell, an expert in forensic pathology, testified that he performed the victim's autopsy. He identified numerous photographs taken during his examination. Photographs showed a small contusion on the right middle finger, a healing scrape on the right arm, and no injuries to the left hand or to the palms of the hands. Photographs also showed a vacuum cleaner cord around the victim's neck, and Dr. Cogswell noted that the cord was around the neck five times and that it was wrapped tight, causing deep impressions and blistering "at the margins." Dr. Cogswell concluded that the victim would have been unable to breathe.

Dr. Cogswell identified a photograph of the victim's closed left eye and testified the small "pinpoint areas" on the eyelid were petechial hemorrhages. He said the hemorrhages were common as a result of manual strangulation because the repeated application and release of pressure around the neck affected blood flow. Two photographs of retracted eyelids showed hemorrhages inside the right and left eyelids and on the scleras. Dr. Cogswell noted that the hemorrhages were associated with the pressure-related phenomenon caused by manual strangulation. He said the

petechial hemorrhages found in the victim's eye were not associated with ligature strangulation because it was the application and release of pressure that caused the hemorrhages.

Dr. Cogswell identified photographs of the front right and left shoulder areas and the chest, which showed purple bruises. He noted the bruising was more intense on the left shoulder. He said that based upon the shape and location, the bruises could have represented fingerprints, although he was uncertain. Photographs showed bruises on the rear left shoulder area. Dr. Cogswell said that the bruises on the rear shoulder were consistent with a hand pressing in the area when considered in conjunction with the bruises on the front shoulder areas.

Dr. Cogswell testified that the internal examination showed a fracture to the thyroid horn and hemorrhages to the strap muscles located above the collarbones where the power cord was around the neck. He concluded that the lower injury to the muscles was associated with the power cord and the upper deep injury to the thyroid horn was associated with manual strangulation. He noted that the deep injury compressed the neck enough to cause the larynx and the spine to bruise from the significant pressure applied to the neck. He noted that although the thyroid horn was commonly fractured during manual strangulation, it was uncommon to find bruising on the rear of the larynx and at the front of the spine.

Dr. Cogswell testified that the lack of injuries to the victim's hands reflected that the victim did not struggle while she was strangled and that the lack of "claw marks" on the victim's neck reflected that the victim did not attempt to remove the power cord from her neck. As a result, Dr. Cogswell concluded that the manual strangulation occurred first, rendering the victim semiconscious or unable to defend herself and that the ligature strangulation was the "final blow." He said that strangulation was relatively quick but took minutes to cause death. He believed the victim struggled for at least one minute. Dr. Cogswell concluded based on a degree of medical certainty that the victim's cause of death was manual and ligature strangulation and that the manner of death was homicide.

On cross-examination, Dr. Cogswell testified that generally, in cases of ligature strangulation, he expected to find a victim's DNA under the victim's fingernails and claw marks on the victim's neck caused by attempts to remove the ligature. He said that in cases of manual strangulation, he expected to find injuries to an attacker's hands or arms because the attacker's wrists were accessible targets and that a victim usually did not have self-inflicted injuries. Relative to the hemorrhages on the victim's front neck muscles, Dr. Cogswell stated that constant pressure on a muscle caused blood to compress out of the muscle and that when a muscle was exposed to alternating pressure and release, hemorrhaging resulted. He said that the hemorrhages indicated the ligature was tightened and loosened as it was applied. Dr. Cogswell said that the victim weighed 230 pounds and that he did not note any injury to her feet. He could not speak to the attacker's state of mind.

The [Petitioner] testified that he grew up in New Orleans, Louisiana, and lived with his grandparents until age twenty. He said that he shared a bedroom with his father in his grandparents' home. The [Petitioner] stated that his grandfather was the "big boss" in the household and that if his grandmother did not obey his grandfather, "it ... got rough." The [Petitioner] said that his aunt sexually abused him between ages six and nine. He said he did not disclose the abuse because his father and grandfather would have been angry and because "it would have been my fault." The [Petitioner] said that he suffered physical abuse from his grandfather when the [Petitioner] did not "do things his way."

The [Petitioner] testified that he had spinal meningitis as a child and that as a result, he had to wear glasses, undergo speech therapy, and relearn how to walk and talk. The [Petitioner] said that he worked between ages seven and sixteen unloading produce trucks with his grandfather. The [Petitioner] said that he had a ninth-grade education and that he learned to read and write at age twenty before the birth of his first child. He stated that he married Angela Rivera when he was age eighteen but that after four days, Ms. Rivera left and the marriage was annulled.

The [Petitioner] testified that he and Ms. Rivera remarried, that they moved to Knoxville when the [Petitioner] was in his late twenties, and that they had two children, Tony and Maria Rivera. The [Petitioner] said that he worked for Mitchell Electric and that Ms. Rivera attended Pellissippi State Community College. The [Petitioner] said that his and Ms. Rivera's relationship was good until the [Petitioner] became ill and that he "woke up one day ... in the [psychiatric] hospital." He said that the marriage deteriorated, that he left the family home, and that he lived in his truck for a few months. The [Petitioner] said that Ms. Rivera had custody of the children, that he asked to visit the children, and that Ms. Rivera beat, hit, and scratched him, resulting in Ms. Rivera's arrest.

The [Petitioner] testified that he met the victim during a two-month, work-related trip to Virginia. He said that they began dating, that he returned to Tennessee, and that the victim did not accompany him. He stated that he and a coworker rented a room from a friend named Amanda. The [Petitioner] said that he helped Amanda move to Nashville and that after arriving in Nashville, the [Petitioner] woke up in a psychiatric hospital with no recollection of what had occurred.

The [Petitioner] testified that his next memory was awaking at the victim's parents' home in Virginia and not knowing how he got there. The [Petitioner] said that he and the victim married while he was in Virginia and that he did not remember the ceremony, although he had seen photographs of the wedding. He said they lived in Virginia for about one year and moved to New Orleans because the victim fought with her family. The [Petitioner] said that the victim's minor son lived with his father.

The [Petitioner] testified that he first knew his and the victim's marriage was troubled when the victim required the [Petitioner] to sleep lower in bed than the

victim in order for the victim to hold the [Petitioner]'s hair. The [Petitioner] identified a photograph of a last will and testament in which Donna Kingsmill, a family friend, bequeathed to the [Petitioner] a house in New Orleans. He noted he repaired the house after Hurricane Katrina. The [Petitioner] also identified the Alltel cell phone as the phone he used to contact workmen at Ms. Kingsmill's house.

The [Petitioner] testified that he and the victim lived in Kenner, Louisiana, and that their relationship deteriorated when the victim began "crying, acting kind of different, didn't want me to go to work." The [Petitioner] said that the behavior lasted four or five months and that he lost his job. He said, though, that he thought he could "handle things" and did not contact the victim's family. He said the victim's uncle spoke to the victim on the telephone when she became upset. The [Petitioner] said that he and the victim lived with his brother in Covington, Louisiana, for two months but left because of tension between the [Petitioner]'s brother's wife and the victim. The [Petitioner] noted he had a close relationship with his brother's wife. The [Petitioner] said that the victim set fire to the [Petitioner]'s brother's property and that as a result, they moved to another house in 1999. The [Petitioner] said that after they moved, the victim did not want the [Petitioner] to leave the house or spend time with other people, including his brother's wife. The [Petitioner] said that he stopped meeting his brother's wife and that the [Petitioner]'s friends stopped spending time with him.

The [Petitioner] testified that he and the victim moved to Baton Rouge, Louisiana, and that while living there, the victim hit him with a baseball bat. He recalled coming home from work one day to find a Wiccan meeting in his living room and said that he made everyone leave, that he and the victim argued, and that the victim hit him in the face with the bat. The [Petitioner] said that he pushed and slapped the victim away and that his right eye was damaged, although he did not call the police. On another occasion, the [Petitioner] stated that he arrived home to find the victim in bed with another woman, that he and the victim argued, and that the victim hit him in the groin with the bat. He said that he did not contact the police, that he went to the hospital, and that he lied when he told the doctor he awoke with the injury. The doctor told the [Petitioner] that as a result of his injury, he could not father any more children.

The [Petitioner] testified that the necklace found on the victim's living room floor belonged to him and that it was a gift from his daughter after Hurricane Katrina. He stated that he and the victim moved to Knoxville in 2005 and that his children, who were teenagers at the time, had a good relationship with the victim until the children began living with the [Petitioner] and the victim in 2006. The [Petitioner] stated that the victim did not like the [Petitioner]'s children living with Ms. Rivera and that the victim became unhappy with the [Petitioner]'s and Maria's close relationship. The [Petitioner] said the victim thought Maria "[c]ouldn't do anything right."

The [Petitioner] testified that the victim remained involved with Wicca after moving to Knoxville, that he and the victim began attending church, and that the victim laughed at the pastor. The [Petitioner] said that the victim bought him a Bible and that he discussed the Bible with the victim's father. He said the victim became upset and accused the [Petitioner] of acting like her parents and told the [Petitioner] to stop speaking with her father. The [Petitioner] said that he suggested marriage counseling and that they saw two counselors, including church counselor Mack Card. The [Petitioner] said they attended seven sessions together. The [Petitioner] said he continued individual sessions with Mr. Card and that when the victim learned of the sessions, she did not permit the [Petitioner] to attend any future sessions. The [Petitioner] said that during an argument about counseling, the victim cut him.

The [Petitioner] testified that he knew the victim had a two-bedroom apartment unit at the nearby complex. He acknowledged that the victim had been dating someone else, that he and the victim would "rendezvous" at the unit, and that the [Petitioner]'s brother's friends used the unit, as well.

The [Petitioner] testified that Tony witnessed an altercation between the victim and the [Petitioner]. The [Petitioner] said that the victim's former employee told the [Petitioner] the victim was having an affair with a coworker, that the [Petitioner] confronted the victim about the affair, that they argued, and that the victim entered the bedroom and slammed the door. The [Petitioner] said he took a shower and heard a "big, giant bang." He said he asked Tony to check on the victim, and Tony saw holes in the bedroom wall. The [Petitioner] said he did not want his children to witness any arguments and sent them to their rooms or outside during an argument. The [Petitioner] testified that on one occasion, Tony witnessed the victim break the [Petitioner]'s wine glasses, that the [Petitioner] told Tony to wait outside, and that the [Petitioner] and Tony attempted to leave in the [Petitioner]'s truck. The [Petitioner] said that the victim threw herself on the hood of the truck, held on to the moving truck, and punched the [Petitioner] in the face through the driver's side window. The [Petitioner] said that he told Tony, "It'll be all right, son," and that he moved the truck until the victim let go. The [Petitioner] said that he and Tony left, that the victim followed them in her car, and that he drove to a shopping center and remained there until midnight to avoid conflict.

The [Petitioner] testified that after the victim moved into the apartment where the killing occurred, the victim broke in his apartment while he and Tony were sleeping and threatened the [Petitioner] and herself with two knives. The [Petitioner] said that he "talk[ed] her down" and that the victim threw the knives on the floor and left. He recalled overturned furniture in the living room.

The [Petitioner] testified that the victim had "thrown punches" at Maria and that the victim told Maria to move out of the family apartment when Maria was age seventeen. He said that he told Maria it might have been better for Maria to leave and that Maria lived with friends for a time. The [Petitioner] said that the victim

moved out of the family apartment around Thanksgiving 2009 and that Tony and Maria lived with the [Petitioner]. The [Petitioner] stated that he continued meeting the victim but that the victim was not permitted to visit his apartment. He said that the victim came to his apartment on April 4, 2010, and that he called the police. The [Petitioner] stated that he began taking medications between April and June 2010 and that he had difficulty taking the medications consistently because he "would come home and my bottles would be empty in the bathroom. The pills would be in the toilet." The [Petitioner] said he received a phone call from an unknown man, who said that he knew where the [Petitioner] and Maria lived and worked and the cars they drove. The [Petitioner] stated that after the man finished speaking, the victim spoke to the [Petitioner]. The [Petitioner] said that he felt threatened and reported it to the police but that the police only gave him a "little victim's card." The [Petitioner] stated that he informed Ms. Rivera, Maria, and Tony about the call.

The [Petitioner] testified that he filed for divorce after hiring attorney John Lockridge. The [Petitioner] said that he worked for Mr. Lockridge's wife, Mary, and that the victim thought the [Petitioner] and Ms. Lockridge were "getting too close." The [Petitioner] stated that he instructed Mr. Lockridge not to file the divorce paperwork because the victim told the [Petitioner] that if Mr. Lockridge remained involved, "Mary was going to remember for the rest of her life what happens when you get involved in somebody's life." The [Petitioner] said that he thought the victim would hurt Mr. Lockridge.

The [Petitioner] testified that he did not know how to delete telephone calls or messages from his cell phone and that he did not delete any information from his phone before the police collected it.

The [Petitioner] testified that on June 5, 2010, he walked to his truck to obtain his medications but that the medications were gone, although he found his watch in the truck's glove compartment. He noted the victim was supposed to have the watch. He stated that he knew the victim had his keys and medications because she was the only person who had the watch. He said that he went to the victim's apartment to get the keys to his truck and the medications.

The [Petitioner] testified that on June 5, 2010, the victim called him at 6:40 a.m. and again at 2:22 p.m. The [Petitioner] said that when he arrived at the victim's apartment, she told him to return later and to knock on the back door, that he complied with her request, and that she permitted him to enter her apartment when he returned. He said that the victim asked him to walk upstairs, that he found her in the bedroom, and that she was not wearing clothes. He said that the victim wanted the [Petitioner] to get into bed with her but that he refused and insisted she put on clothes. He said he told the victim that he was tired of all the fighting, that he loved her, and that he wanted to "live in peace." He said the victim told him that she needed him in her life. He told the victim to talk to her father, and the victim became

angry and left the room. The [Petitioner] said that when he walked downstairs, the victim was standing in the doorway with the front door open.

The [Petitioner] testified that the victim said, "You know who's in control of this? I am," that the [Petitioner] walked toward her in an attempt to leave, and that the victim came toward the [Petitioner] with a box cutter. The [Petitioner] said that he fell backward on the steps and that the victim fell on top of him. He said that as he attempted to push the victim away, "all of a sudden just everything ... went into slow motion. I thought I [saw] somebody coming in behind her ... I just started getting real scared. It just turned purple ... weird and slow. And then it's blank." He said that he saw the victim screaming at him but that he perceived it in slow motion. He said that he did not remember closing or locking the door and that the next thing he remembered was standing by his truck, which was parked in an adjacent parking lot. He said he feared the victim might break the truck's windshield as she had done previously.

The [Petitioner] testified that his next memory was lying in the grass next to his truck at a park and that a little boy woke him because the boy's ball rolled between the [Petitioner] and his truck. The [Petitioner] said that he thought he was in Louisiana and shut his eyes and that it was night when he woke. He stated he sat in his truck because he was scared and did not recognize his location. He said that he received a telephone call from Ms. Rivera, who told him that the police "broke her door down and threw her on the floor" and that the victim was dead. He denied telling Ms. Rivera that he killed the victim. The [Petitioner] said that he called his children and "[e]verybody was crying and screaming. They didn't want me to come home." The [Petitioner] thought that he called Ms. Rivera again and left the park. He said he had no reason to go to Loudon County and did not know where he was going at the time.

The [Petitioner] testified that he did not intend to hurt the victim when he went to her apartment. He denied entering the apartment against the victim's will or with the intent to kidnap, harm, or kill her. He did not remember restraining the victim's movements or strangling her.

On cross-examination, the [Petitioner] testified that both he and the victim were responsible for the problems in their relationship. He said that on May 16, 2010, the victim was not living at the same apartment complex as the [Petitioner] and his children, that he knew the victim was dating another man, and that the [Petitioner] did not know anything about the man. The [Petitioner] later denied knowing of Mr. Ross's existence on May 16. Relative to May 16, the [Petitioner] denied kicking in the victim's door and did not remember speaking with Mr. Ross or the victim.

The [Petitioner] testified that he did not know when he married the victim or when his and Ms. Rivera's divorce was obtained and denied that he committed bigamy. The [Petitioner] said that the victim rented the two-bedroom apartment while they were going through house foreclosure proceedings.

22

The [Petitioner] testified that Sean Powell was his former neighbor and that he saw Mr. Powell the day before Eric McLean killed Mr. Powell. The [Petitioner] stated that he knew the facts of the McLean case but noted that the McLean case was different because Mr. McLean was living with Ms. McLean at the time of the killing. The [Petitioner] stated that he spent time with the victim periodically at the two-bedroom apartment unit. He said that the victim moved out of the family apartment because he told the victim she was no longer welcome at the apartment after she returned from visiting her family around Thanksgiving 2009.

The [Petitioner] testified that he did not vandalize Mr. Ross's car and that he did not know Mr. Ross's keys were in his truck. The [Petitioner] said that the victim met him to tell him about the order of protection and that they continued talking on the telephone during the following weeks. The [Petitioner] remembered leaving the victim a voicemail message stating, "Remember the situation with Sean? That's what you've started here ... That's what's going to happen." The [Petitioner] said that the message was a response to the threatening telephone call he received from Mr. Ross and the victim. The [Petitioner] said that the victim's threatening his children created a similar situation to the McLean case. The [Petitioner] stated that he was concerned because he did not know what the victim told Mr. Ross. The [Petitioner] said that Mr. Ross might have thought the [Petitioner] was a horrible person and that Mr. Ross would have been the victim's hero. The [Petitioner] did not think his message was threatening and said he did not believe in hurting people. The [Petitioner] said that his intention was to communicate to the victim that a person can get hurt when the person plays with other people's lives.

The [Petitioner] testified that he was slightly upset when he was served with the order of protection because he did not understand why the victim obtained it. He noted the victim called him late at night and wanted to see him but obtained the order of protection. The [Petitioner] said that he and the victim discussed the victim's renting the apartment where the killing occurred with Ms. Stutsman, that Ms. Stutsman asked the [Petitioner] to examine a leaking swimming pool at that apartment complex, and that he drove to the complex, examined the pool, and left. He said that Ms. Stutsman went to his apartment after the visit and spoke to him about the order of protection. He stated that Ms. Stutsman told him to stay away from the victim's apartment. He denied stalking the victim.

The [Petitioner] testified that after his conversation with Ms. Stutsman, he continued visiting the victim's apartment when he wanted and when the victim requested. The [Petitioner] said that he and the victim obtained orders of protection against the other. He stated that he tried to make the victim happy and to take care of her. The [Petitioner] said that he did not know whether his going to the apartment complex to examine the pool happened after his discussion with Ms. Stutsman. He said that it was possible he went there after the order of protection was served. He stated that he went to the victim's apartment when she requested, which was usually late at night. He said that when he met with the victim, he parked in the "little lower

parking lot" rather than in front of the victim's apartment because the victim "didn't want the neighbors to be in our business." He stated that he was not concerned about his truck being seen at the victim's apartment and that he had nothing to hide. He did not know why the victim wanted to hide the [Petitioner]'s truck.

The [Petitioner] testified that he did not strangle or kill the victim and that his DNA was not found on the victim. He acknowledged that his DNA was found under the victim's fingernails but said that the photographs taken after his arrest showed no scratches on his arms or hands. The [Petitioner] admitted, though, struggling with the victim on the day of her death. The [Petitioner] acknowledged Mr. Dilworth's testimony that at 3:30 p.m. on the day of the victim's death, the [Petitioner] and the victim were talking outside the victim's apartment, but he denied the victim had been crying.

The [Petitioner] testified that after speaking to the victim, he left the apartment complex. He acknowledged the testimony of Mr. Dilworth and Ms. Parsons that they heard loud noises and said it was possible he and the victim made those noises. The [Petitioner] stated that the scream Ms. Parsons heard could have been from the [Petitioner] as he fell backward on the stairs. He acknowledged that photographs from the victim's apartment showed the victim's purse, massage chair, and makeup bag on the front step outside the victim's apartment. The [Petitioner] stated that he knew the victim was scheduled to work until 7:00 p.m. He said that he arrived at the victim's apartment the second time around 4:00 or 5:00 p.m.

The [Petitioner] testified that he did not know the victim called her mother at 3:57 p.m. and that the victim's mother might have said he was not there at that time. He acknowledged that the 9–1–1 call was placed at 5:12 p.m. He said that he walked through grass and by the front entrance of the victim's apartment before walking to the back door. He stated that he wiped his boots inside the door but did not remove them. He denied dragging the victim by her throat through the front door and slamming and locking the front door. He said that he might have bruised the victim's shoulders when he pushed her away. He acknowledged that the pattern of bruises on the victim's shoulders indicated the person stood behind her and stated that the other person he saw in the apartment might have inflicted the bruises.

The [Petitioner] testified that he did not tell Mr. Dilworth, Ms. Parsons, and Mr. Wicks that the conflict between the [Petitioner] and the victim was "a domestic dispute" and to "[m]ind your own business." Relevant to Mr. Wicks's testimony that nobody was outside the front door, the [Petitioner] said Mr. Wicks's testimony conflicted with Ms. Parsons's and Mr. Dilworth's assertions that they beat on the front door in an attempt to help the victim. The [Petitioner] stated that the witnesses could have been mistaken when they identified the [Petitioner] as the man attacking the victim because they had previously seen the [Petitioner] working on the property.

24

The [Petitioner] testified relative to his police statement that he discussed events that occurred one or two years before the victim's death. When questioned about his failure to mention the box cutter in his statement to the police, the [Petitioner] said, "I believe in my statement I was talking about things that happened" one or two years previously. He acknowledged that photographs showed a box cutter near the victim's body. The [Petitioner] said that he was issued a box cutter at work, that he was scheduled to work the night the victim died, and that he did not carry his work box cutter away from work. He denied using the box cutter found in the victim's apartment to vandalize Mr. Ross's car.

The [Petitioner] testified relative to the recording from the police cruiser that he did not remember seeing the police cruiser's blue lights but that he recalled someone grabbing and pulling him from the truck. He acknowledged the officer's testimony that the [Petitioner] drove through a traffic light and attempted to accelerate after his truck was disabled.

The [Petitioner] testified that he did not have a romantic relationship with Ms. Kingsmill, although they had "pet names" for each other. The [Petitioner] denied repairing properties as part of a joint venture with Ms. Kingsmill. The [Petitioner] acknowledged that the Alltel cell phone was found in his truck and said that his daughter could have erased the data on the phone. The [Petitioner] said he did not remember erasing the phone's data. The [Petitioner] acknowledged witness testimony showing that he called the victim twice as much as the victim called him after the order of protection was obtained. The [Petitioner] said he sent text messages to three women during that time, which included the victim, a woman known as Sherry, and Ms. Whittaker.

The [Petitioner] testified that during his police interview, he "couldn't even understand what [he] was saying." He denied telling the police that his and the victim's disputes involved her boyfriend. The [Petitioner] acknowledged he told the police that he slapped and punched the victim and that he had "never seen that look in her eyes." When asked whether he omitted from his police statement the events inside the apartment, the [Petitioner] said, "I just told them what I know happen[ed]."

The [Petitioner] testified that he might have told Ms. Whittaker that he did not kill the victim and that he was not in Knoxville at the time of the victim's death. The [Petitioner] said that he "was saying a lot of things about that night" and that the only time he remembered hitting the victim was after she hit him with a baseball bat. The [Petitioner] agreed he called and sent text messages to the victim stating that he needed her. He said that the victim did not return his call but thought she did not call him because she was angry with him, not because she was with another man. The [Petitioner] acknowledged a voicemail message in which he said,

> You know what my guess is, is that you're with him. And my guess
> is that you f—— him, which means you cheated on me, so I'm going

25

to go ahead and quit calling you because I've been trying to make this right . . . it would have been nice if you would have told me the truth . . . See you in court.

The [Petitioner] did not remember leaving a message stating that the victim was "playing games" with the [Petitioner], that the [Petitioner] was trying to get well, and that the victim should tell the [Petitioner] if she was "with him." The [Petitioner] acknowledged that he could have left a message asking the victim to tell the [Petitioner] the truth about her relationship and stating, "I can't go on until I know this. If you would tell me that you're sleeping with him ... if I know that you kissed him or you have been with him, it's over for me." The [Petitioner] denied leaving the messages because he was angry the victim had a boyfriend, lived in her own apartment, and was "fending for herself." The [Petitioner] stated that he obtained the apartment for the victim and thought that the victim paid for her groceries and car with the [Petitioner]'s money.

The [Petitioner] testified that he did not know whether the victim had lupus and that he unsuccessfully attempted to have her seek treatment. He did not remember telling the police that he gave the victim his pain medication because she could not afford medication. The [Petitioner] said that the victim stole his depression medication and told him the medication made him worse. He stated that on one occasion, the victim called him while she was in pain and that he took pain medication to her. He acknowledged the autopsy report reflected that the victim's drug and alcohol tests were negative.

The [Petitioner] testified that he did not tell the victim that he wanted a divorce throughout the marriage. He said that he discussed divorce when "we were having problems with other people" in the relationship. He denied telling the victim that he would not have sex with her because she was unclean. He said, though, that they did not have sexual relations after the [Petitioner] confronted one of the victim's partners, who reported having an incurable sexually transmitted disease. The [Petitioner] denied telling the victim that he would seek a divorce after his children left home. The [Petitioner] also denied telling the victim that his divorce from Ms. Rivera was caused by the [Petitioner]'s adultery.

The [Petitioner] testified that it was possible he called the victim a "w——" during the marriage but denied that he told her to move on with her life. He agreed he told the victim that he would help her move into her apartment but that she should not hope for reconciliation. The [Petitioner] denied telling the victim that he "had a good mind to slit her throat." He acknowledged that he may have told the victim that their marriage was based on a lie, that he wanted to end the marriage because he learned "what she was doing," and that he felt emotionally numb. He agreed he told the victim to move on and give him a divorce. The [Petitioner] said that he confronted the victim when he learned she was having an affair. He said that he and the victim's father and uncle discussed issues relative to his and the victim's sexual relationship but denied that the discussions might demean a woman. The

26

[Petitioner] agreed he told the victim that massage therapy was not a legitimate profession and denied accusing the victim of being gay. He acknowledged that he might have accused the victim of having an affair with her friend. He agreed he told the victim's parents things about the victim's past. The [Petitioner] denied blaming the victim for the loss of their house but said the victim could have helped more by working.

The [Petitioner] testified that the victim practiced Wicca but that the victim attended church in an effort to network for her business. When asked whether the [Petitioner]'s characterization of the victim's mocking the church was accurate, the [Petitioner] said the victim was angry about the "way she was raised." The [Petitioner] identified a letter he wrote to the victim "when the Scott situation was going on" and said he apologized for slapping the victim after she hit him with the baseball bat.

On redirect examination, the [Petitioner] testified that on May 16, 2010, cell phone records did not reflect the [Petitioner] placed a midday call to the victim. Relative to the voicemail message in which he referenced Sean Powell, the [Petitioner] said that when he left the message, he was concerned he or Mr. Ross would be hurt. He said he left the message after the conversation in which Mr. Ross threatened Maria. The [Petitioner] testified that although he did not remember what occurred between his and the victim's confrontation at the bottom of the stairs and his waking in the park, he did not believe he killed the victim.

The [Petitioner] testified that the victim became angry when denied something she wanted. He agreed no DNA or fingerprint analyses were performed on the box cutter. He did not recall what he told the police about his abilities to read and write. The [Petitioner] said relative to the voicemail messages he left on the victim's cell phone, he was trying to discuss back taxes the victim owed. He stated that the victim cashed checks from massage clients and did not deposit the money. The [Petitioner] said that he disparaged the victim's profession because on one occasion he saw the victim and a client leaving a massage room in which the victim had received flowers, candy, and coffee from the client. The [Petitioner] said the victim told him that the client gave the items to her and noted the client was "shocked" when the client saw him.

On recross-examination, the [Petitioner] testified that the victim received gifts from her massage clients, including a client he knew as Scott, and that he did not like it. He denied being jealous. The [Petitioner] agreed that the victim did not want the [Petitioner]'s children coming to her place of business.

Tony Rivera, the [Petitioner]'s son, testified that when he lived with the [Petitioner] and the victim, he spoke to Ms. Rivera sparingly and that Ms. Rivera came to visit them periodically. Tony said that he spoke to Ms. Rivera less often when he lived with the [Petitioner] but that "it wasn't negative." Tony stated that the victim moved out of the family apartment in winter 2009 but visited often. He said that on

27

Valentine's Day 2010, he, Maria, and the [Petitioner] were leaving their apartment for dinner when the victim arrived in her car and motioned for the [Petitioner] to roll down his window. Tony said that the victim was angry, that the victim said the [Petitioner] had stated that he no longer wanted a relationship, and that the victim said ending the relationship was not an option. Tony said that the [Petitioner] began driving away and that the victim followed them for several miles until becoming separated in traffic.

Tony testified that on April 4, 2010, the victim pounded on their apartment doors and windows and demanded entry. He identified a photograph of dents in the apartment door and said that the victim caused the damage. He stated that the [Petitioner] told him not to open the door and to wait until she left. Tony said that the victim called him a coward and told him the [Petitioner]'s tires were slashed. Tony said that in early June 2010, the [Petitioner] lost weight and became pale. He said the [Petitioner] did not eat and spent most of his time in his bedroom.

Tony testified that on June 2, 2010, he sent a text message to the victim at the [Petitioner]'s instruction. He recalled the message stated that everything could work out and that they all could get along. He said, though, that he did not want to get along with the victim and that he wanted the victim to leave the [Petitioner] alone.

On cross-examination, Tony testified that the [Petitioner] and the victim's relationship was "rocky" toward the end, that they fought, and that the [Petitioner] "managed to keep a level head most of the time." Tony denied knowing that the [Petitioner] went to the victim's apartment when he was prohibited from being there. Tony said that he knew the victim obtained an order of protection against the [Petitioner] on May 17, 2010. Tony stated that the [Petitioner] said the victim had threatened Tony's life and that Tony obtained an order of protection against the victim on May 18. Tony said that the [Petitioner] had a "group meeting" regarding the victim's order of protection and that the group decided to obtain orders of protection against the victim.

Relative to the Valentine's Day incident, Tony testified that the victim did not exit her car, cling to the [Petitioner]'s truck, or hold onto the tailgate. Tony said that the [Petitioner] started a romantic relationship with Ms. Whittaker in early 2010 and that Tony visited Ms. Whittaker's apartment with the [Petitioner]. Tony stated that he was happy the [Petitioner] was moving on with his life. Tony said he thought he learned from the [Petitioner] in May 2010 that the victim had a boyfriend. He denied knowing the [Petitioner] was jealous.

Tony testified that he knew Sean Powell but denied hearing the [Petitioner] talk about Mr. Powell in relation to the victim's boyfriend. Tony said that in the days before the victim's death, the [Petitioner]'s demeanor and actions did not change. He stated that he saw the [Petitioner] the night before the victim's death.

28

On redirect examination, Tony testified that he obtained the order of protection because the [Petitioner] told him that the victim had threatened to kill Tony and Maria. Tony said that in early 2010, he was present during an incident in which the victim jumped on the hood of the [Petitioner]'s truck to keep him from leaving the apartment complex.

Maria Rivera, the [Petitioner]'s daughter, testified that she lived with the victim and the [Petitioner] for about three years after the couple returned to Knoxville. Maria said that the victim criticized her for playing trombone in her high school marching band and for participating in the Reserve Officers' Training Corps (ROTC) because "girls don't do that." Maria said she never witnessed physical violence between the [Petitioner] and the victim. Maria identified a photograph of a Hurricane Katrina survivor pendant found at the crime scene and said she bought it for the [Petitioner]. Maria said that on June 3, 2010, she sent the victim a text message at the [Petitioner]'s request. She thought the message stated that "we wanted to work things out, that everything will be okay." She said, though, she wanted the victim to leave them alone. She said that around June 2010, the [Petitioner] lost significant weight and muscle tone, did not eat, and was pale.

On cross-examination, Maria testified that she knew the victim obtained an order of protection against the [Petitioner] but that she did not know the victim alleged the [Petitioner] kicked in the victim's apartment door and vandalized a car. She said that the [Petitioner] called a "group meeting" to discuss the order of protection, that the [Petitioner] suggested Maria obtain an order of protection against the victim, and that Maria thought it was a good idea because the victim had threatened Maria previously. Maria said later, though, that the victim had not threatened her life prior to this occasion.

On redirect examination, Maria testified that on one occasion, the victim said that she would have punched Maria in the face if the victim had not feared losing her massage license. Maria did not know why the [Petitioner] asked her to send a text message to the victim.

Mary Lockridge testified that she was a bank teller supervisor and that the victim and the [Petitioner] banked with her employer. She said that she also worked staging houses and that the victim approached her about hiring the [Petitioner] as an assistant. Ms. Lockridge stated that the [Petitioner] worked for her as an electrician and plumber, moved furniture, and hung draperies. She said that the [Petitioner] assisted in staging about 100 homes.

Ms. Lockridge testified that the [Petitioner] was "a very good husband ... very dedicated to their having a better life[.]" She said that the [Petitioner] and the victim purchased a home while the [Petitioner] worked for her, that the [Petitioner] held another job, and that the [Petitioner] performed maintenance work at her condominium. She stated that the [Petitioner] was generally alert, attentive, efficient, and punctual. She said that around June 2010, the [Petitioner] became

unkempt, erratic, distant, and unfocused, that he went to the wrong jobs sites multiple times, and that he damaged furniture. She said that the [Petitioner] was confused regarding when he was paid for work performed, that he lost his home, and that she thought the [Petitioner] was having financial difficulty.

Ms. Lockridge testified that she and the [Petitioner] discussed his taking medications and that she asked about the types of medication he took because he had lost a significant amount of weight. She said she encouraged the [Petitioner] to obtain a divorce. She recalled one occasion during which she and the [Petitioner] were traveling to a job site and noted the victim called him fifty times. Ms. Lockridge said that the victim sent the [Petitioner] a text message threatening to kill the [Petitioner] and Ms. Lockridge, that Ms. Lockridge saw the message, and that Ms. Lockridge took the threat seriously. Ms. Lockridge said she feared for the [Petitioner]'s safety.

Ms. Lockridge testified that her husband was a divorce attorney and that Ms. Lockridge promised to advance the [Petitioner] money in exchange for the [Petitioner]'s meeting with Mr. Lockridge to discuss a divorce because "things were getting very scary." She noted that the victim usually picked up Tony from work but that the victim called Ms. Lockridge asking her to send the [Petitioner] to pick up Tony. Ms. Lockridge said that Tony did not live with the victim at the time.

On cross-examination, Ms. Lockridge testified that the victim sent the threatening text message in April 2010. She said that she and the [Petitioner] discussed his medications in May 2010 and that the [Petitioner] did not mention he was taking medications when he began acting erratically.

John Lockridge, the [Petitioner]'s divorce attorney, testified that he met the [Petitioner] when the [Petitioner] worked for Ms. Lockridge. Mr. Lockridge stated that the [Petitioner] retained him to file a complaint for divorce and that Mr. Lockridge filed the complaint in May 2010. Mr. Lockridge said that sometime after he filed the complaint, the [Petitioner] came to his office parking lot at 8:30 a.m., that the [Petitioner] was upset and agitated, and that the [Petitioner] wanted Mr. Lockridge to dismiss the divorce proceedings.

Dr. Kathryn Smith, an expert in psychological evaluations, testified that she evaluated the [Petitioner] for approximately nine hours. She said she conducted a clinical interview, reviewed the [Petitioner]'s medical and police records, observed his behavior, and spoke with him and family members about his mental state at the time of the victim's death. She stated that at time of her evaluation, the [Petitioner] was taking medications administered by the jail. She said that she evaluated the [Petitioner] using four standardized instruments and concluded that the [Petitioner] had a major recurrent depressive disorder, which meant lifelong, severe, and repeated episodes of depression without psychosis. She also diagnosed the [Petitioner] with post-traumatic stress disorder, alcohol dependence that was in remission, avoidant personality disorder, and depressive personality disorder. Dr.

Smith noted that she could not determine whether the [Petitioner] was suffering from post-traumatic stress disorder at the time of the victim's death or whether the [Petitioner] developed it after the killing. Dr. Smith concluded that the [Petitioner]'s symptoms were genuine and that his symptom pattern showed a genuine psychological disorder.

Dr. Smith testified that she concluded that the [Petitioner] was suffering from severe mental illness, severe major depression, and a panic disorder for at least two weeks before the killing and that these conditions were cumulative to the [Petitioner]'s underlying personality disorders. She said that two weeks before the victim's death, the [Petitioner] sought treatment from Dr. Antonio Ramos at the suggestion of Ms. Lockridge. Dr. Ramos reported to Dr. Smith that the [Petitioner] was depressed, tearful, sad, not sleeping, anxious, and unable to "get his thoughts straight." Dr. Smith said that Dr. Ramos prescribed the [Petitioner] two antidepressants and that pharmacy records showed the [Petitioner] obtained both prescriptions. Dr. Smith said the [Petitioner]'s family told her that the [Petitioner] had stopped eating, had lost weight, and had been "preoccupied with threats, perceived threats to his kids and their safety[.]" She stated that the [Petitioner] was not functioning or thinking rationally and noted that antidepressants took four to six weeks to become effective. She concluded that at the time of the victim's death, the [Petitioner] was incapable of forming intent.

Dr. Smith testified that she would not describe the [Petitioner]'s police interview as a coherent discussion. She said that the [Petitioner] was fidgety and restless, did not make eye contact with the detectives, put his head down, and did not communicate coherently. She noted the detectives appeared confused and did not know about what the [Petitioner] was talking. She said that the [Petitioner] had a distorted sense of time when discussing the events and that the [Petitioner] did not look well.

On cross-examination, Dr. Smith testified that in her opinion, the [Petitioner] lacked the capacity to premeditate the victim's death because of his mental illnesses. She said that she was not asked to consider whether the [Petitioner] was incapable of any premeditated act and could not conclude that the [Petitioner] lacked the capacity to premeditate "anything in his life." She stated that if the [Petitioner] lied about his previous history, it might affect the outcome of her evaluation but that she also relied upon other records and interviews with his family to reach her conclusions.

Dr. Smith testified that the [Petitioner]'s major depressive disorder alone might have rendered him incapable of acting knowingly or with premeditation. She said that due to the severity of the [Petitioner]'s mental illnesses and his sleep deprivation, he was "not thinking straight." Dr. Smith said that the information she gathered from the [Petitioner]'s family and friends was inconsistent with a person who refused to accept the end of his marriage. She said that she spoke with Ms. Lockridge, Tony, Maria, and Mr. Card, the church counselor, and that she reviewed

an incident report from the sheriff's department, the recording of the [Petitioner]'s police interview, and a portion of his medical records. Dr. Smith said that she was unable to obtain records related to the [Petitioner]'s childhood meningitis diagnosis and suicide attempt and agreed that the [Petitioner]'s history before the time of the victim's death was uncorroborated. She agreed that if the [Petitioner] lied about his history, her conclusions were wrong. Dr. Smith said that she did not interview the [Petitioner]'s brother or Ms. Rivera. Dr. Smith stated that if the [Petitioner] had other therapy records, it might have been important to her evaluation.

Dr. Smith testified that she spent three hours administering tests and six hours interviewing the [Petitioner]. She said that she evaluated the [Petitioner] eight months after his arrest, that she knew he had been charged with first degree murder, that the [Petitioner] knew Dr. Smith had been retained by his attorney, and that he was very cooperative. Dr. Smith stated that she was not asked to determine the [Petitioner]'s competency to stand trial. Dr. Smith acknowledged that she reviewed records from Dr. Edgar Jessee relative to a 2006 "marital situation." Dr. Smith said that Dr. Jessee did not note any report of abuse or threats from the victim and that Dr. Jessee's notes were sparse. Dr. Smith stated that Mr. Card's pastoral records from 2008 to 2010 did not note abuse or violence. Dr. Smith said that during marital therapy, the victim reported not wanting to have a physical relationship with the [Petitioner]. However, Dr. Smith said that during individual therapy sessions, the [Petitioner] stated the victim attempted to have sexual relations with him when he attempted to become independent from the victim. Dr. Smith stated that Mr. Card thought the [Petitioner]'s "departure [from the victim] was imminent" and that the [Petitioner] did not report depression or anxiety to Mr. Card.

Dr. Smith testified that Dr. Ramos's May 21, 2010 records reflected that the [Petitioner] reported sexual performance difficulties and that the [Petitioner]'s testosterone level, which had been low previously, was evaluated as a possible source of the depression. Dr. Smith said she knew that four days before the [Petitioner]'s doctor's appointment, the [Petitioner] was accused of kicking in the victim's door and vandalizing a car. Dr. Smith said Dr. Ramos's records reflected that the [Petitioner] was crying, depressed, anxious, and unable to think. She said, though, the records showed that the [Petitioner] denied being suicidal or homicidal or having hallucinations or delusions.

Dr. Smith testified that the [Petitioner] was more articulate and expressive than she expected but that being well-spoken was not inconsistent with the [Petitioner]'s self-reported learning disabilities. She said the [Petitioner] reported having depression, feeling hopeless, and having suicidal ideations. Dr. Smith said that the [Petitioner] showed many symptoms, although he had been taking strong antidepressants while in jail. She said that the [Petitioner] reported having nightmares about the victim in which the victim beat or stabbed him and that the [Petitioner] was afraid the victim "was . . . waiting to get him." Dr. Smith said the [Petitioner] felt ashamed for tolerating the victim's abuse and blamed himself for staying in the relationship and allowing "all the things that happened with his kids."

32

Dr. Smith testified that she had not reviewed the autopsy report and that it seemed irrational for a person to strangle another person "[t]hat much." She stated that the [Petitioner]'s report of the victim's escalating violence and his belief the victim would not "let him go" was not inconsistent with the victim's living in her own apartment. She said that the [Petitioner] continued giving the victim money and that the [Petitioner]'s decision to stop the divorce proceedings may have been an attempt to appease the victim. Dr. Smith agreed the [Petitioner] had no reliable memory of the victim's death and said she did not trust the timing of the [Petitioner]'s memories. Dr. Smith said she spoke to Ms. Lockridge relative to the [Petitioner]'s change in work performance. Dr. Smith said Tony's report of the [Petitioner]'s normal behavior in the days before the victim's death was not surprising. She said Tony and Maria reported not paying close attention to the [Petitioner] before the victim's death.

Dr. Smith testified that Mr. Dilworth's testimony relative to the [Petitioner]'s dragging the victim inside the apartment, locking the door, and telling Mr. Dilworth it was a domestic dispute might suggest the [Petitioner] was capable of deliberate acts. She said, though, that the conduct did not exclude the possibility that the behavior was heavily influenced by depression. She said she was not aware of the [Petitioner]'s parking away from the victim's apartment unit, the [Petitioner]'s flight from the victim's apartment complex, or the [Petitioner]'s throwing prescription bottles into the bushes. Dr. Smith said the behavior did not sound rational. She stated that erasing data on a cell phone might indicate "a mindfulness of what he was doing and trying to hide his tracks." Dr. Smith said that she knew the [Petitioner] left the victim's apartment through the back door, walked to the tree line, jumped over a fence, ran to his truck, and quickly left the scene. She said these facts indicated that the [Petitioner] knew where he parked his truck and intended to leave the area.

Dr. Smith testified that she did not review the recordings of the 9–1–1 calls. Relative to the [Petitioner]'s calling Ms. Rivera and reporting he had killed the victim, Dr. Smith said that she did not know if the [Petitioner]'s statements indicated consciousness of guilt "or just awareness of an act." Dr. Smith did not review text or voicemail messages the [Petitioner] sent the victim after the order of protection was issued. Dr. Smith said that she vaguely recalled the McLean case and that she did not know Sean Powell was the [Petitioner]'s former neighbor. She said that it might have been important to know if the [Petitioner] had referenced Mr. Powell to the victim.

Dr. Smith testified that the validity of the mental health evaluations was dependent on her observations and the [Petitioner]'s self-report. Relative to whether the [Petitioner] was malingering, Dr. Smith said that the [Petitioner] was classified as "genuine responder."

Dr. Smith testified that she had performed between 200 and 250 clinical forensic evaluations on criminal defendants, that about twenty evaluations were for the purpose of determining whether a defendant had a diminished capacity, and that two were first-degree murder cases. Dr. Smith said that she did not utilize the most widely accepted personality test in this case because the [Petitioner] did not have the requisite eighth-grade reading level. Relative to other types of tests with built-in validity scales to determine malingering, she stated those tests were problematic because the [Petitioner]'s first language was not English and because one test had a high rate of false positives.

Dr. Smith testified that post-traumatic stress disorder might have been caused by one acute trauma or by the cumulative effect of many traumas. She said that the [Petitioner]'s traumas were caused by living with the victim in his adulthood and by his grandfather's abuse in his childhood. She stated that people suffering from post-traumatic stress disorder did not always experience flashbacks. She said that it was too simplistic to conclude that the [Petitioner] would have avoided the victim if he suffered from post-traumatic stress disorder and that the entire situation had to be considered. On redirect examination, Dr. Smith stated that a person with the [Petitioner]'s level of mental illness could function normally in the person's everyday life.

State v. Rivera, No. E2014-01832-CCA-R3-CD, 2016 WL 2642635, at *1-27 (Tenn. Crim. App. May 6, 2016), *perm. app. denied* (Tenn. Sept. 22, 2016) (footnote and page numbers omitted) ("*Rivera I*").

Petitioner's Knox County jury considered his indicted charges of (1) first-degree premeditated murder, (2) first-degree felony murder in the attempt to perpetrate a kidnapping, (3) first-degree felony murder in the attempt to perpetrate a burglary, (4) especially aggravated kidnapping, (5) especially aggravated burglary, (6) aggravated assault, (7) aggravated burglary, (8) burglary of a vehicle, and (9) vandalism [Doc. 8-1 p. 6-10]. At the conclusion of trial, Petitioner was convicted of second-degree murder as a lesser-included offense of first-degree premeditated murder [*See* Doc. 8-23 p. 78]. He was convicted as charged on the two first-degree felony murder counts, and he was likewise convicted of especially aggravated burglary and aggravated assault [*Id*. at 79, 80, 82, and 83]. The jury found him not guilty of the other charges [*Id*. at 81, 84, 85, and 86]. The trial court adopted the jury's verdict and imposed a sentence of life imprisonment

for first-degree felony murder in the attempt to perpetrate a burglary [Doc. 8-1 p. 72; Doc. 8-10 p. 137-139].

At a subsequent sentencing hearing, the trial court merged the convictions for second-degree murder and first-degree felony murder in an attempt to perpetrate a kidnapping into the conviction for first-degree felony murder in the attempt to perpetrate a burglary [Doc. 8-24 p. 32-33]. The trial court imposed sentences of ten years for especially aggravated burglary and five years for aggravated assault, and the court directed that those sentences run concurrently with Petitioner's life sentence for first-degree felony murder, for a total effective sentence of life imprisonment [Doc. 8-1 p. 67-71, 92-95; Doc. 8-24 p. 38-39]. Petitioner filed a motion for a new trial, which was denied at the conclusion of the hearing on the motion [Doc. 8-1 p. 97-99, 101-04, 106, 108; Doc. 8-26 p. 24-32].

On direct appeal, the Tennessee Court of Criminal Appeals ("TCCA") affirmed the convictions. *Rivera I*, 2016 WL 2642635, at *46. The Tennessee Supreme Court denied discretionary review [Doc. 8-33].

Thereafter, Petitioner filed a petition for post-conviction relief in the trial court, to which the State responded [Doc. 8-34 p. 4-11, 15-16]. Following the appointment of counsel, Petitioner filed an amended petition [*Id*. at 21-24]. The trial court conducted an evidentiary hearing, where trial counsel, Mike Whalen, testified that after reviewing discovery in the case, he discussed with Petitioner what evidence he anticipated would be presented at trial [Doc. 8-35 p. 4-5]. His trial strategy was to pursue Petitioner's diminished capacity, explaining:

> There were independent witnesses, neighbors, who saw Mr. Rivera with his estranged wife at the apartment and then going into the apartment. There was some testimony about the — a physical confrontation in the doorway that they claimed to see. The doorway was closed. They heard a struggle inside, and then at some point saw Mr. Rivera go out the back door. Police were called. When they went

35

inside, Ms. Rivera was — was on the floor and had been — was wrapped in a vacuum cleaner cord and was deceased at that point.

And so the idea was to present — after discussion with Mr. Rivera about his family history and some abuse that took place in his early life and his lack of education, formal education, beginning work at age seven or eight and working pretty much as a full-time employee from then on out, and the relationship between himself and the victim, which was confrontational and ugly at times and — on her part, we developed a defense of diminished capacity, and that extent, we put on Dr. Katie Smith to testify.

[*Id*. at 5-6].

Counsel was aware from the discovery that a truck with Petitioner's license tag number was seen leaving the scene of the offense, that it was pursued and stopped later that night, and that Petitioner was found in it [*Id*. at 6]. He was also aware that Petitioner's ex-wife reported in a 911 call that Petitioner had killed the victim [*Id*.]. Counsel was additionally aware that Petitioner gave a recorded statement to law enforcement officers that he went to the apartment and argued with the victim about a man he believed was the victim's boyfriend [*Id*. at 6-7]. Counsel explained:

They took a statement from him after the wreck in, I want to say, Lenoir City, Loudon County, and there were some coherence problems in that — with that statement, and so we — we felt that tied in as well with this diminished capacity, and the place where he was actually found was — there were other issues there as well, but — and I had also talked — spoken with the children a couple of times, and we prepared them. They testified at trial about the relationship with the victim, and — and their view and their experience of the relationship between Mr. Rivera and the victim, which we felt played into the diminished capacity defense.

[*Id*. at 7].

Counsel was aware from discovery that the victim was found in her apartment with a vacuum wrapped around her neck and that the medical evidence showed that she was strangled to death both manually and by ligature strangulation [*Id*.]. Counsel explained his decision to pursue a diminished capacity defense in light of Petitioner's evidence of guilt as follows:

Well, there was a good deal of evidence in the statements from witnesses, from the neighbors, the direct next door neighbor, and there was a discussion about the —

36

seeing them outside on the stoop earlier, and then hearing this argument going on inside after that, and then at some point going over and pushing the door open and seeing this confrontation going on inside the apartment.

So at that point, I didn't believe there was any validity in a defense that said we — we weren't there and we didn't do it, and so the question was once we're placed there and at the scene and involved, then how is it we can explain how this happened, and that's how we came to the diminished capacity defense.

[*Id.* at 8]. Counsel had no evidence that anyone else was inside the victim's apartment at the time of the offense [*Id.*]. When asked if this evidence was consistent with what Petitioner reported, counsel responded:

There were inconsistences between what Mr. Rivera told me and the various other statements that either he made to another — another witness or to the police. I believe those inconsistencies to be a part of the diminished capacity. I think there were parts of things he could not recall, parts of things he had blacked out, parts of things he just didn't recall, and parts of things he recalled differently, and I believe that had to do with his psychological state at the time.

[*Id.* at 10]. Counsel was also aware that Petitioner had told someone that he was not in Knoxville when the offense occurred [*Id.* at 10-11].

Concerning Petitioner's decision whether to testify, counsel testified that he explained it was "a hard situation, but that in this case, we had facts" that he "couldn't do anything about except try to explain" [*Id.* at 11]. Counsel believed "that the best narrator" of Petitioner's history was Petitioner himself, as aided by Dr. Smith's testimony [*Id.* at 11-12]. Counsel also presented testimony from Petitioner's children, who had a "horrible relationship" with the victim and testified about witnessing the victim's own "violent or aggressive behavior" [*Id.* at 12-13]. When asked about Petitioner's amenability to testifying, counsel stated that Petitioner "went back and forth" about whether to testify, but that counsel "thought [they] could get through it" [*Id.* at 14]. Counsel stated that he believed that Petitioner trusted him and that they "spent considerable time discussing it and preparing for his testimony" [*Id.*]. Counsel made it clear to Petitioner that the

37

decision whether to testify belonged to Petitioner, and that, in the end, Petitioner took counsel's advice to testify [*Id*. at 15-16]. Counsel stated that he thought Petitioner "did as best he could under the circumstances" and that "his demeanor and his limited abilities that came out through that testimony supported . . . [the] theory of diminished capacity [*Id.* at 16-17]. Counsel stated at the post-conviction hearing that he still believed that his trial strategy was sound, and that the trial "went as well as it could have gone" [*Id*. at 22-23]. He did testify that he did not consider challenging the fact that the especially aggravated burglary prosecution was based on the same conduct as the felony murder offenses, as "[t]here were much more serious fish to fry, and that burglary issue just didn't rise to the top of [his] attention at that point [*Id*. at 23].

Petitioner testified at the evidentiary hearing that counsel went over the evidence and discovery with him and offered advice on the trial strategy [*Id*. at 25-26]. They discussed whether Petitioner should testify, and trial counsel advised him to, assuring him it would be the "best" and "right thing" to do [*Id*. at 26-27]. Petitioner stated he would not have testified absent counsel's advice to do so, but that because he trusted counsel's advice, he decided to testify [*Id*.]. Petitioner conceded, however, that the decision was ultimately his [*Id*.].

At the conclusion of the proof, the trial court denied Petitioner's claim that trial counsel rendered ineffective assistance in advising him to testify [Doc. 8-34 p. 26-31]. [1] Petitioner filed a notice of appeal, and the TCCA found no error in the post-conviction court's judgment. *Rivera v. State*, E2019-00798-CCA-R3-PC, 2020 WL 5988550 (Tenn. Crim. App. Oct. 9, 2020), *perm. app.*

---

[1] The post-conviction court also found that trial counsel was deficient in failing to raise the issue that Petitioner's especially aggravated burglary and felony murder charges were based on the same conduct, and it modified Petitioner's especially aggravated burglary conviction to aggravated burglary and reduced the sentence for that offense to six years in order to remedy the "slight[] prejudice[]" caused by counsel's deficiency [Doc. 8-34 p. 30-31].

38

*denied* (Tenn. Feb. 5, 2021) ("*Rivera II*"). The Tennessee Supreme Court denied discretionary review [Doc. 8-43].

On July 30, 2021, Petitioner filed the instant § 2254 petition with a supporting memorandum of law [Docs. 1 and 2]. The Court directed Respondent to file a response to the petition [Doc. 7], and Respondent complied by filing the State-court record [Doc. 8] and an answer [Doc. 13]. Petitioner filed a reply, as amended, to the State's answer [Docs. 13-16]. This matter is ripe for review.

## II.     LEGAL STANDARD

The Court's review of the instant petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which prevents the grant of federal habeas relief on any claim adjudicated on the merits in a state court unless that adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established United States Supreme Court precedent; or (2) resulted in a decision based on an unreasonable determination of facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d)(1) & (2); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). Review under 28 U.S.C. § 2254(d) is limited to the record presented to the state court that resolved the claim. *Cullen v. Pinholster*, 563 U.S. 170, 181-83 (2011).

Federal habeas relief may be granted under the "contrary to" clause where the state court (1) arrives at a conclusion opposite that reached by the Supreme Court on a question of law; or (2) decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). Under the "unreasonable application" clause, a federal court may grant relief where the state court applies the correct legal principle to the facts in an unreasonable manner. *Williams*, 529 U.S. at 407-08; *Brown v. Payton*, 544 U.S. 133, 141 (2005). Whether a decision is "unreasonable" is an objective inquiry; it does not turn on whether the decision is merely incorrect. *See Schriro*, 550 U.S. at 473 ("The question under

39

AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable − a substantially higher threshold."); *Williams*, 529 U.S. at 410-11. This standard will allow relief on a federal claim decided on its merits in state court only where the petitioner demonstrates that the State ruling "was so lacking in justification that there was an error understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). When evaluating the evidence presented in state court, a federal habeas court presumes the correctness of the state-court's factual findings unless the petitioner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e).

The doctrine of procedural default also limits federal habeas review. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) (holding prisoner's procedural default forfeits his federal habeas claim). A procedural default exists in two circumstances: (1) where the petitioner fails to exhaust all of his available state remedies, and the state court to which he would be required to litigate the matter would now find the claims procedurally barred, and (2) where a state court clearly and expressly bases its dismissal of a claim on a state procedural rule, and that rule provides an independent and adequate basis for the dismissal. *See, e.g., Coleman v. Thompson*, 501 U.S. 722, 731-32, 735 n.1 (1991).

As to the first circumstance, a federal district court generally cannot consider a § 2254 petition unless the Petitioner has first exhausted all available state court remedies for each claim in his petition. 28 U.S.C. § 2254(b)(1); *O'Sullivan*, 526 U.S. at 842. This requirement is satisfied when the petitioner fairly presents his federal claim through the state's appellate court system. *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995); *see also* 28 U.S.C. § 2254(c) ("An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available

procedure, the question presented."). Fair presentation means that "the substance of a federal habeas corpus claim must be presented to the state courts." *Picard v. Connor*, 404 U.S. 270, 278 (1971). "It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (internal citations omitted). Instead, the doctrine of exhaustion requires a petitioner to present "the same claim under the same theory" to the state courts as he seeks to present in federal court. *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987); *see also Wagner v. Smith*, 581 F.3d 410, 418 (6th Cir. 2009) (finding constitutional claim must be presented in federal court under the same theory as presented in State appellate process). In Tennessee, presentation of a federal claim to the TCCA satisfies the exhaustion requirement. *Adams v. Holland*, 330 F.3d 398 (6th Cir. 2003); *see also* Tenn. S. Ct. R. 39 (establishing presentation of claim to TCCA is sufficient to exhaust State remedies).

If a habeas petitioner failed to fairly present his federal claim to the state courts prior to raising it in a federal habeas petition, there is typically no longer a state remedy to exhaust, as Tennessee's one-year statute of limitations and "one petition" rule on post-conviction petitions generally prevent a return to state court to litigate any additional constitutional claims. *See* Tenn. Code Ann. § 40-30-102(a) (one-year limitation period) and § 40-30-102(c) ("one petition" rule); *Hodges v. Colson*, 727 F.3d 517, 530 (6th Cir. 2013) (noting Tennessee petitioner "no longer has any state court remedies to exhaust" when he failed to present claim in initial post-conviction petition). In such cases, the claim is technically exhausted but procedurally defaulted. *See Jones v. Bagley*, 696 F.3d 475, 483 (6th Cir. 2012) ("When a petitioner has failed to present a legal issue to the state courts and no state remedy remains available, the issue is procedurally defaulted.").

The second circumstance giving rise to a procedural default occurs where "a state procedural rule . . . prevent[ed] the state courts from reaching the merits of the petitioner's claim[.]"

41

*Seymour v. Walker*, 224 F.3d 542, 550 (6th Cir. 2000) (citing *Wainwright v. Sykes*, 433 U.S. 72, 80, 84-87 (1997)). A federal court is generally prevented from considering a federal-law claim "arising from the judgment of a state court if the state judgment rests on a state-law ground that is both independent of the merits of the federal claim and an adequate basis for the state court's decision." *Munson v. Kapture*, 384 F.3d 310, 313-14 (6th Cir. 2004) (internal quotation marks and alterations omitted). In such cases, a procedural default occurs when the petitioner fails to comply with a state procedural rule, the state court enforced the rule, and the state procedural rule was an adequate and independent state ground for denying review of a federal constitutional claim. *Guilmette v. Howes*, 624 F.3d 286, 290 (6th Cir. 2010) (citing *Tolliver v. Sheets*, 594 F.3d 900, 928 n.11 (6th Cir. 2010)).

A procedural default may be circumvented, allowing federal habeas review of the claim, only where the prisoner can show cause and actual prejudice for the default, or that a failure to address the merits of the claim would result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750; *see also Wainwright*, 433 U.S. at 87, 90-91. "Cause" is established where a petitioner can show some objective external factor impeded defense counsel's ability to comply with the state's procedural rules, or that his trial counsel rendered ineffective assistance. *Coleman*, 501 U.S. at 753. The prejudice demonstrated to overcome the default must be actual, not merely a possibility of prejudice. *See Maupin v. Smith*, 785 F.2d 135, 139 (6th Cir. 1986) (citations omitted); *see also United States v. Frady*, 456 U.S. 152, 170 (1982) (holding prejudice showing requires petitioner to bear "the burden of showing, not merely that errors [in the proceeding] created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire [proceeding] with error of constitutional dimension") (emphasis in original).

A fundamental miscarriage of justice of occurs "where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S.

478, 496 (1986). A claim of actual innocence "requires [the] petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). Actual innocence in this context "means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998).

## III. ANALYSIS

### A. Ineffective Assistance of Trial Counsel

In his federal habeas petition, Petitioner raises the following claims of ineffective assistance of counsel: (1) counsel failed to provide him or his original post-conviction counsel with copies of the trial transcripts and discovery; (2) counsel failed to fully investigate his case and present more evidence about the victim's violence against and control over Petitioner; (3) counsel failed to collect the box cutter stored at his workplace; (4) counsel failed to seek comparative DNA testing of Gerald Ross to determine if he was a match for DNA collected from the vacuum power cord used to strange the victim; (5) counsel failed to challenge the admission of hearsay statements regarding Petitioner mentioning an unrelated homicide to the victim; (6) counsel failed to request a Bill of Particulars; (7) counsel failed to move to suppress Petitioner's confession to law enforcement officers as coerced; (8) counsel was ineffective in failing to better prepare Dr. Smith for her testimony at trial; (9) counsel failed to request a special jury instruction on flight; and (10) the cumulative effect of counsel's deficiencies necessitates relief [*See* Doc. 1 p. 5; Doc. 2 p. 6-16].

None of these issues were pressed through the post-conviction appeal to the TCCA [*See, e.g.*, Doc. 8-36]. Therefore, they are procedurally defaulted. Accordingly, Petitioner is not entitled to a merits review of this claim unless he can establish either a miscarriage of justice would result absent such review, or that cause and prejudice exist for the default.

43

Petitioner may not rely on the miscarriage of justice exception in this case due to the overwhelming evidence of his guilt presented at trial. Specifically, the Court notes that multiple witnesses testified that they observed Petitioner on top of the screaming victim and him dragging her into the victim's apartment by her neck; witnesses testified that Petitioner pulled the victim inside the apartment, closed the door, and locked it; Petitioner told a witness that he and the victim were having a domestic dispute and to go away; and the victim was later found dead on the living room floor from manual and ligature strangulation. *See, e.g., Riveria I*, 2016 WL 2642635, at *29.

Therefore, the Court must consider whether Petitioner can demonstrate cause and prejudice for the default. In *Martinez v. Ryan*, the United States Supreme Court held that the ineffective assistance of post-conviction counsel may, under limited circumstances, qualify as cause to excuse the procedural default of ineffective assistance-of-trial counsel claims. *Martinez*, 566 U.S. 1, 16 (2012); *Sutton v. Carpenter*, 745 F.3d 787, 795-96 (6th Cir. 2014) (applying *Martinez* in Tennessee). To constitute "cause" to overcome a procedural default under *Martinez*, a petitioner must show that (1) he has a substantial claim of ineffective assistance of trial counsel; (2) counsel on initial state collateral review was nonexistent or ineffective; (3) the state collateral proceeding was the first occasion on which to raise a claim of ineffective assistance of trial counsel; and (4) state law requires that the ineffectiveness of trial counsel claim be raised for the first time during the state collateral proceeding. *Trevino v. Thaler*, 569 U.S. 413, 423 (2013).

Petitioner's first allegation of ineffective assistance is that counsel failed to provide him or his post-conviction counsel with the case file and discovery, which required Petitioner to file his original post-conviction petition and this § 2254 action without the proper reference material [Doc. 2 p. 6; Doc. 15 p.2]. *Martinez* is inapplicable to this claim, as it challenges counsel's effectiveness on appeal and thereafter. *Davila v. Davis*, 137 S. Ct. 2058, 2063 (2017) (holding *Martinez*

44

exception does not extend beyond claims of ineffective assistance of trial counsel). Therefore, this claim is procedurally defaulted.

Plaintiff's remaining claims of ineffective assistance of counsel were defaulted in the post-conviction appeal and not in the initial post-conviction proceedings in the trial court.[2] That is, Petitioner raised the issues in his pro se post-conviction petition, but counsel did not incorporate those claims into his amended petition or present any argument as to those claims at the evidentiary hearing [*See, e.g.*, Doc. 8-35]. Therefore, Respondent argues, *Martinez* is inapplicable to Petitioner's remaining ineffective assistance of counsel claims, as they were defaulted for failure to appeal the issues to the TCCA. *See West v. Carpenter*, 790 F.3d 693, 698-99 (6th Cir. 2015) (holding "attorney error at state-postconviction appellate proceedings cannot excuse procedural default" under *Martinez*); *Atkins v. Holloway*, 792 F.3d 654, 661 (6th Cir. 2015) (same).

Conversely, Petitioner argues that *Martinez* is applicable to his claims of ineffective assistance, as Petitioner raised these issues in his pro se petition for post-conviction relief, and appointed counsel, who was operating under a conflict of interest due to his relationship with Petitioner's trial counsel, failed to pursue those claims in the evidentiary hearing before the post-conviction court or on post-conviction appeal [Doc. 15 p. 4][3]. Moreover, Petitioner notes,

---

[2] The Court notes that each of Petitioner's claims of ineffective assistance were included in the initial post-conviction petition, with the exception of claims concerning the box cutter and DNA [Doc. 8-34 p. 4-13]. Petitioner raised the box cutter and DNA issues, but he did not allege ineffective assistance of trial counsel concerning them. Therefore, Petitioner failed to exhaust these particular ineffective assistance of counsel claims, and they are defaulted. *See Jones*, 696 F.3d at 483. Regardless, even if the Court were to consider these claims as fairly presented to the post-conviction trial court, they were not presented to the TCCA on appeal of the decision.

[3] Petitioner explicitly maintains that he is not raising a freestanding claim of ineffective assistance of post-conviction counsel [Doc. 15 p. 3-4]. Indeed, such a claim would not be cognizable in these proceedings, as there is no right to the effective assistance of counsel in a post-conviction proceeding. *Coleman*, 501 U.S. at 752 (providing that "[t]here is no constitutional right to an attorney in state post-conviction proceedings" and that, therefore, "a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings") (citations omitted); 28

45

Tennessee's ruling in *Burkhart* prohibits litigants from filing pro se pleadings if they are represented by counsel, and thus, he could not present these claims to the TCCA [*Id.* at 4-5, referencing *State v. Burkhart*, 541 S.W.2d 365 (Tenn. 1976)]. Therefore, Petitioner maintains, these claims are defaulted only because post-conviction counsel failed to raise the claims on appeal from the denial of post-conviction relief.

The Court finds Petitioner's arguments unavailing. First, the post-conviction trial court did not decline to consider the issues raised by Petitioner in his initial brief, but rather, expressly denied those claims [Doc. 8-34 p. 31]. Second, there is no indication that Petitioner attempted to reassert these claims on post-conviction appeal, and Petitioner's argument that he could not do so is undermined by the fact that he did present the claims pro se in a subsequent Rule 11 application to the Tennessee Supreme Court [*See* Doc. 8-42]. Therefore, the Court finds Petitioner cannot avail himself to the *Martinez* exception to overcome the procedural default of these claims. *See, e.g., West*, 790 F.3d at 698-99.

Nonetheless, out of an abundance of caution, the Court will consider whether any of Petitioner's ineffective assistance claims are "substantial" enough to excuse the procedural default. Under the *Martinez* framework, a claim is substantial if the petitioner can demonstrate that it has "some merit" under the standards governing claims of ineffective assistance. *Hill v. Mitchell*, 842 F.3d 910, 938 (6th Cir. 2016). That standard is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). In order to prove ineffective assistance of counsel, a habeas petitioner must demonstrate: (1) constitutionally deficient performance, and (2) actual prejudice as a result of such ineffective assistance. *Strickland*, 466 U.S. 668 (1984). Deficiency is established when a

_____

U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.").

46

petitioner can demonstrate that counsel's performance falls below an objective standard of reasonableness as measured by professional norms, such that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Id*. at 687-88. A reviewing court's scrutiny is to be highly deferential of counsel's performance, with an effort to "eliminate the distorting effects of hindsight." *Id*. at 689. In fact, counsel is to be afforded a presumption that his actions were the product of "sound trial strategy" and undertaken with the exercise of reasonable professional judgment. *Id*.

The prejudice inquiry "asks whether it is 'reasonably likely' the result would have been different" if counsel's performance had not been deficient. *Richter*, 562 U.S. at 111 (quoting *Strickland*, 466 U.S. at 696). While "[t]his does not require a showing that counsel's actions 'more likely than not altered the outcome,' . . . the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.'" *Id*. at 111-12 (quoting *Strickland*, 466 U.S. at 693, 697). "The likelihood of a different result must be substantial, not just conceivable." *Id*. at 112. Therefore, merely showing that "a court can[not] be certain counsel's performance had no effect on the outcome" or that "it is possible a reasonable doubt might have been established if counsel acted differently" is insufficient to demonstrate prejudice. *Id*. at 111.

Petitioner first maintains that counsel's failure to provide him with the case file, discovery, and transcripts of his trial forced him to prepare both his original post-conviction petition and this action without the benefit of those materials [Doc. 2 p. 6]. However, Petitioner fails to explain how not having these materials affected his ability to present his claims to the courts, and he has not demonstrated that he was prejudiced by counsel's failure to provide the materials. Therefore, to the extent Petitioner raises this issue as an independent claim of ineffective assistance of counsel, it is not substantial.

47

Second, Petitioner argues that counsel performed ineffectively in failing to investigate and present evidence of the victim's violence toward him [*Id*. at 6-7]. However, Petitioner's counsel presented evidence of the victim's violence against and control over Petitioner through the testimony of Petitioner, his two children, and Dr. Smith [*See, e.g.,* Doc. 8-8; Doc. 8-9]. At the post-conviction hearing, trial counsel clarified that he considered the victim's alleged violence in concert with whether Petitioner should testify, and that he ultimately concluded that Petitioner was in the best position to explain his relationship with the victim [Doc. 8-35 p. 11-14]. Petitioner has not demonstrated a deficiency in counsel's decision how to present evidence of the relationship between Petitioner and the victim, nor has he demonstrated that the presentation of additional evidence would have yielded a different result. Therefore, this claim is not substantial.

Petitioner next claims that trial counsel should have elicited evidence that Petitioner's work-issued box cutter was stored at his place of employment to respond to the State's insinuation that the box cutter found at the victim's apartment belonged to Petitioner [Doc. 2 p. 8]. However, the evidence supporting the State's case came from eyewitness testimony of Petitioner physically struggling with the victim and dragging her into her apartment by the neck, the fact that the victim was then found strangled inside her apartment, and Petitioner's flight from pursing law enforcement officers. Therefore, proof regarding the location of Petitioner's work-issued box cutter at the time of the crime would have had not impacted the result of trial, and this claim is not substantial under *Martinez*.

Petitioner also claims that trial counsel should have requested DNA testing of Gerald Ross, whom the victim dated [*Id*. at 8-9]. At trial, two contributors were identified from the DNA analysis of the vacuum power cord that was used to strangle the victim [Doc. 8-6 p. 125-26]. One contributor was the victim, and the other was unknown [*Id*.]. Petitioner was excluded as a contributor [*Id*.]. Petitioner claims that DNA analysis was conducted on the portions of cord that

48

would have been used to strangle the victim, and therefore, it was critical to perform a DNA analysis on Mr. Ross [Doc. 15 p. 7-8]. However, Petitioner fails to explain how, even if testing had determined that the other contributor was Mr. Ross, it would have undermined the evidence of Petitioner's guilt. Despite Petitioner's protestations to the contrary, such evidence would only demonstrate that Mr. Ross had, at some point, touched the vacuum cord. Accordingly, the Court finds this claim is not substantial under *Martinez*.

Petitioner next claims that the State was allowed to introduce hearsay statements about Petitioner threatening the victim with references to an unrelated homicide, and that defense counsel should have objected to the State's improper cross-examination of him on this point [Doc. 2 p. 9-10]. Petitioner relies on *United States v. Cronic*, 466 U.S. 648 (1984) as the legal standard governing this claim [Doc. 2 p. 10]. However, in *Cronic*, a case decided the same day as *Strickland*, the Supreme Court held prejudice should be presumed where (1) there is a complete denial of counsel during a critical stage of trial; (2) where counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing"; or (3) the circumstances surrounding the trial made it so unlikely that any lawyer could provide effective assistance. *See id*. at 659-60. The Court finds the record plainly demonstrates that trial counsel actively defended Petitioner throughout the trial. *Coleman v. Bradshaw*, 974 F.3d 710, 720 n.4 (6th Cir. 2020) ("A petitioner is not entitled to a presumption of prejudice because his counsel was deficient 'at specific points' of the proceeding.") (citation omitted). Therefore, *Cronic*'s presumption of prejudice is inapplicable in this case, and Petitioner must demonstrate that his claim is substantial under the *Strickland* framework.

On direct appeal, the TCCA considered the admissibility of the evidence Petitioner challenges and found the elicited evidence admissible. *Rivera I*, 2016 WL 2642635, at **41-42. Therefore, aside from proof of Petitioner's overwhelming guilt, the full appellate review Petitioner

49

received on this State-law issue undermines an assertion of prejudice flowing from any alleged failure on defense counsel's part. Moreover, Petitioner explained to the jury how his statements regarding the unrelated homicide were nonthreatening, and, in fact, the jury ultimately acquitted Petitioner of first-degree premeditated murder and convicted him, *inter alia*, of second-degree murder. Therefore, this claim is not substantial under *Martinez*.

Petitioner maintains that trial counsel rendered ineffective assistance in failing to file a motion for a bill of particulars, which would have required the State to elect to prosecute him on either a charge of first-degree murder or felony murder [Doc. 2 p. 10-12]. Because counsel did not file such a motion, however, Petitioner contends he was forced to defend against prosecution on the dual theories, which confused the jury and allowed the State to obtain a conviction merely by proving that he killed the victim [*Id*.].

The Tennessee Supreme Court has held that the purpose of a bill of particulars is to (1) provide the "defendant with information about the details of the charge against him"; (2) allow an opportunity "to avoid prejudicial surprises at trial"; and (3) enable a "defendant to preserve a plea against double jeopardy." *State v. Sherman*, 266 S.W.3d 395, 408-09 (Tenn. 2008) (internal citations and internal quotation marks omitted). It is not intended as a discovery device or as a way "to lock the State into a specific theory of prosecution." *Id*. at 409. Here, defense counsel testified that he received discovery in this case, reviewed that discovery with Petitioner, and developed a defense of diminished capacity around the expected proof [Doc. 8-35, p. 4-23]. Therefore, counsel was aware of the charges against Petitioner. Additionally, even if counsel had requested a bill of particulars, it would have not "locked" the State into one theory of murder, and Petitioner has failed to explain how his defense would have been different with the additional information. Finally, securing a bill of particulars would not have impacted the verdicts returned by the jury, and as the TCCA noted on direct appeal, Petitioner is entitled to no relief for the

50

purportedly inconsistent verdicts. *Rivera I*, 2016 WL 2642635, at *29. Accordingly, the Court finds that Petitioner has failed to demonstrate that this claim is substantial under *Martinez*.[4]

Petitioner additionally argues that trial counsel rendered ineffective assistance in failing to file a motion to suppress Petitioner's recorded statement as coerced [Doc. 2 p. 13-14]. Petitioner has not presented any evidence to indicate that such a motion would have been successful if counsel had pursued one. Nonetheless, even assuming the success of a motion to suppress, the direct evidence established that Petitioner was the individual who strangled the victim, and testimony established that Petitioner had already confessed to his ex-wife by the time he gave his statement. Therefore, seeking to exclude Petitioner's recorded statement would have had little, if any, impact on the verdict. This claim is not substantial under *Martinez*.

Petitioner next maintains that defense counsel provided ineffective assistance in failing to provide Dr. Smith with certain records to help prepare her testimony [Doc. 2 p. 13-14]. Even if counsel were under an obligation to provide certain records to this defense expert, her testimony reflects a great deal of information that she reviewed in forming her expert opinion testimony, and she was not unable to form an opinion due to lack of information. Furthermore, there is no reason to suspect a reasonable probability of a different trial result had certain documents been provided to Dr. Smith prior to her testimony, as Dr. Smith was able to fully develop and present her opinion on the issue of diminished capacity. The fact that the credibility of that opinion was tested through ordinary cross-examination is not a basis to suspect that a review of additional information would have had an impact in this case, and this claim is not substantial under *Martinez*.

---

[4] "The Double Jeopardy Clause 'protects against . . . multiple punishments for the same offense.'" *Brown v. Ohio*, 432 U.S. 161, 165 (1977) (quoting *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969)). Here, Petitioner's convictions based on alternate theories merged into Petitioner's life sentence for his burglary-related felony murder conviction, thereby eliminating double jeopardy concerns [Doc. 8-1 p. 67, 92-93].

51

Petitioner also contends that trial counsel should have sought a jury instruction that flight is not necessarily an indicator of guilt [Doc. 2 p. 15]. In this case, the jury was instructed that it could infer guilt based upon Petitioner's flight from the scene of the offense, although it was for the jury to determine what effect this might have [Doc. 8-23 p. 69]. The instruction specifically noted that "an entirely innocent person may take flight and such flight may be explained by the proof offered, or by the facts and circumstances of the case" [*Id*.]. Therefore, the basis of Petitioner's argument is unclear. Nevertheless, there is no basis to suspect a reasonable probability of a different result had the flight instruction not been given. Therefore, this claim is not substantial under *Martinez*.

Finally, Petitioner seeks habeas corpus relief due to the cumulative effect of trial counsel's ineffectiveness [Doc. 2 p. 16]. However, Petitioner has not demonstrated that he received the ineffective assistance of counsel. *See Getsy v. Mitchell*, 495 F.3d 295, 317 (6th Cir. 2007) (holding that in absence of existence of constitutional error at trial, "there are simply no errors to cumulate"). Regardless, the Sixth Circuit has held that a cumulative error claim is not a proper basis for habeas relief post-AEDPA. *See Moore v. Parker*, 425 F.3d 250, 256-57 (6th Cir. 2005).

Accordingly, the Court finds that Petitioner's claims of ineffective assistance are procedurally defaulted and barred from review.

### B. State's Failure to Investigate, Collect, or Examine Certain Evidence

Petitioner claims that the State failed to examine or investigate (1) whether Gerald Ross could have been a contributor to the DNA found on the vacuum power cord that Petitioner used to strangle the victim; (2) blood or urine samples from Petitioner after he crashed his truck while fleeing law enforcement officers in order to determine whether he was voluntarily intoxicated; (3) a psychological examination of Petitioner; (4) the box cutter stored at Petitioner's workplace; (5) 911 calls purportedly made by Petitioner against the victim; and (6) Petitioner's phone calls, texts,

and/or relationship with Donna Kingsley after law enforcement officers seized Petitioner's phone and saw the calls and text messages between the two [Doc. 2 p. 16-20].

Petitioner did not raise any of these issues in his direct appeal or in his post-conviction appeal [*See* Doc. 8-27; Doc. 8-36]. Accordingly, they were not properly raised in the trial court and presented on appeal as required for the exhaustion of State-court remedies. 28 U.S.C. § 2254(b). Because of Tennessee's statute of limitations and prohibition against successive petitions, there are no longer state remedies available to Petitioner. *See* Tenn. Code Ann. § 40-30-102(a) (one-year limitation period) and § 40-30-102(c) ("one petition" rule). Therefore, the claims are technically exhausted but procedurally defaulted. *See, e.g., Jones*, 696 F.3d at 483.

Petitioner offers no proper basis to excuse the default of these claims. To the extent Petitioner relies upon *Martinez* to establish cause, that decision is inapplicable here because the underlying claims are those of alleged failures of the State, not claims of ineffective assistance of trial counsel. *See Davila*, 137 S. Ct. at 2062 (reiterating that *Martinez* does not extend beyond claims of ineffective assistance of trial counsel); *see also Abdur-Rahman v. Carpenter*, 805 F.3d 710, 714, 716 (6th Cir. 2015) (declining to apply *Martinez* to claims of suppressed evidence, prosecutorial misconduct, trial error, ineffective assistance of appellate counsel, and cumulative error). Further, Petitioner cannot rely on the fundamental miscarriage of justice exception in view of the overwhelming evidence of his guilt. Therefore, this claim is procedurally barred, and the Court is prohibited from considering its merits.

### C.     Abuse of Discretion (Evidentiary Rulings)

Finally, Petitioner challenges decisions by the trial court to admit or exclude particular evidence at trial [Doc. 2 p. 20-21]. He claims that the trial court erroneously authorized the admission of evidence that the victim feared Petitioner, including the admission of an order of protection sought by the victim against Petitioner, which the TCCA noted on direct appeal was

admitted by the State without objection.  *Rivera I*, 2016 WL 264234, at \*42.  He also argues that the trial court erroneously excluded evidence that the victim was often violent toward him, including a separate order of protection and phone recordings [Doc. 2 p. 20-21].

To the extent that this claim is cognizable as a federal claim under § 2254(a)[5], the claim is procedurally defaulted.  Petitioner did not raise this claim in either direct appeal or in the post-conviction appeal, and State-court remedies are no longer available to him.  *See* Tenn. Code Ann. § 40-30-102(a) (one-year limitation period) and § 40-30-102(c) ("one petition" rule).  Therefore, the claim is technically exhausted but procedurally defaulted.  *See, e.g., Jones*, 696 F.3d at 483.

Petitioner offers no proper basis to excuse the default, and, to the extent he seeks to rely on *Martinez* to do so, that decision is inapplicable as the instant claim is one of trial court error, not one of ineffective assistance of trial counsel.  *See Davila*, 137 S. Ct. at 2062; *Abdur-Rahman*, 805 F.3d at 714, 716.  Petitioner cannot rely upon the fundamental miscarriage of justice exception in light of overwhelming evidence of his guilt.  Therefore, this claim is procedurally defaulted and barred from a merits review.

## IV.    CERTIFICATE OF APPEALABILITY

A petitioner must obtain a certificate of appealability ("COA") before he may appeal this Court's decision denying federal habeas relief.  28 U.S.C. § 2253(c)(1).  A COA will not issue unless a petitioner makes "a substantial showing of the denial of a constitutional right" of any claim rejected on its merits, which a petitioner may do by demonstrating that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  To obtain a COA on a claim that has been rejected on procedural grounds, a petitioner must demonstrate "that jurists of reason

---

[5] The Court notes that the evidentiary rulings of a state court are generally not cognizable in federal habeas review.  *See, e.g., Moreland v. Bradshaw*, 699 F.3d 908, 923 (6th Cir. 2012).

54

would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484. Applying this standard, the Court concludes that a COA should be denied in this case.

## V.      CONCLUSION

Petitioner has failed to demonstrate an entitlement to federal habeas relief. Therefore, his petition for a writ of habeas corpus will be **DENIED**, and this action will be **DISMISSED WITH PREJUDICE**. A certificate of appealability from this decision will be **DENIED**.

Further, the Court **CERTIFIES** that any appeal from this action would not be taken in good faith and would be totally frivolous. Fed. R. App. P. 24.

**AN APPROPRIATE JUDGMENT ORDER WILL ENTER.**

**SO ORDERED:**


s/Clifton L. Corker
United States District Judge